**PRUDENTIAL–BACHE SECURITIES, INC., Plaintiff–Appellee,**

v.

**James M. STRICKLIN, Defendant–Appellant.**

No. 89–2042.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1989.

Decided Dec. 6, 1989.

L. Holmes Eleazer, Jr. (Fenton T. Erwin, Jr., Weinstein & Sturges, P.A., Charlotte, N.C., on brief), for defendant-appellant.

Richard Byron Whisnant (John R. Wester, Robinson, Bradshaw & Hinson, P.A., Charlotte, N.C., on brief) for plaintiff-appellee.

Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and ERVIN, Chief Circuit Judge, and HILTON, United States District Judge, sitting by designation.

POWELL, Associate Justice:

The question presented is whether appellee wrongfully liquidated appellant's trading positions in "naked put options" on October 16, 1987. We find that appellee's action was authorized by contract and does not provide a legal defense to a valid debt owed by appellant to appellee. Accordingly, we affirm the district court's grant of appellee's motion for summary judgment.

### I.

Appellant James M. Stricklin was a broker in the Charlotte office of the brokerage firm J.C. Bradford & Company. On March 5, 1987, he signed an agreement with appellee Prudential–Bache Securities, Inc. opening a personal trading account. Appellant used his Prudential–Bache account to sell (or "write") put option contracts based on the Standard & Poors Index. For a fixed premium, one of appellant's customers could purchase the option to sell to appellant, within some period of time, a certain number of "shares" in the Standard & Poors Index for a fixed price. If the index rose above the fixed price during the period of the option, the customer would not exercise the option since he could sell the shares for a higher price on the open market. The option would then expire, and appellant would keep the premium. If the index declined below the fixed price, the customer would exercise the option, and appellant would have to buy the shares at a price higher than the price for which he could then sell those shares on the open market. The greater the decline in the index, the greater appellant's losses.

If appellant also owned put option contracts, or maintained a short position, on the Standard & Poors Index, his positions would be "covered." If a customer exercised an option, appellant could purchase the customer's shares and then immediately sell those shares at a fixed price to a third party. Appellant did not hold such positions. The put option contracts he sold were "naked" (or "uncovered"). As such, he needed either to deposit in his Prudential–Bache account an amount equal to the aggregate exercise prices of all of the put option contracts he wrote or to maintain his account "on margin." Appellant chose the latter. In essence, he deposited with appellee a portion of the money needed to cover all of the options he sold and borrowed the rest from appellee.

Once this relationship is established, the holder of the option will look to the brokerage house, not to the broker operating the account on margin, for performance in the event of exercise. *See* G. Munn, *Encyclopedia of Banking and Finance* 738 (8th ed. 1983). If appellant's customers exercise their options, appellee will purchase the shares for the price stated in the put option and then post a loss to appellant's account. The amount of the loss is the difference between the amount paid for the shares and the value of those shares on the open market. If the losses exceed the original deposit, appellee can recover this amount from appellant.

As the Standard & Poors Index drops, the put writer's losses increase, thus increasing his liability to appellee. Since the

index can drop hypothetically all the way to zero, this liability can increase almost infinitely.[1] Since brokers often cannot pay back such enormous losses, securities firms try to limit their exposure by using two methods. First, the firm can issue a margin call. This means that the put writer must deposit more of his own funds into the account to continue activity. Second, the firm can liquidate the put writer's position by buying back all of the put options the writer sold. This is generally done at a substantial loss, but it eliminates the possibility of greater losses if the index drops even farther.

## II.

Friday, October 16, 1987, was the first of two consecutive trading days in which our nation's securities exchanges took historic plunges. At 9:30 a.m., losses in appellant's account exceeded $100,000.00. *See* Joint Appendix ("J.A.") at 48–49, 78. To protect itself from further losses, appellee—by telephone—issued a margin call for appellant's account. Appellant stated that he did not have enough cash immediately available to meet the call, but could do so by Monday. *See id.* at 77. The stock market continued to plummet, creating ever-escalating losses on appellant's account. At approximately 10:45 a.m., appellee notified appellant that it was closing out his positions by buying back all of the put options appellant had written. The total loss on appellant's account was $134,713.91.

Appellee filed suit to recover the amount due on the account. Appellant defended and counterclaimed, asserting that appellee had wrongfully terminated his positions by failing to give him the customary 24 hours to meet his margin calls. The district court granted appellee's motion for summary judgment. The court found that appellee's liquidation of the account was authorized by the contract appellant signed to establish his margin account. The court also held that, given the volatile state of the

market and the fact that appellant's negative account balance meant essentially that he was trading with appellee's money, appellee's actions were prudent.

## III.

The Client Agreement signed by appellant states in pertinent part:

> Whenever in your [appellee's] discretion you deem it desirable for your protection (and without the necessity of a margin call) ... you may, without prior demand, tender, and without any notice of the time or place of sale, all of which are expressly waived, ... buy any securities, or commodities or contracts relating thereto of which my account or accounts may be short, in order to close out in whole or in part any commitment in my behalf ... and neither any demands, calls, tenders or notices which you may make or give in any one or more instances nor any prior course of conduct or dealings between us shall invalidate the aforesaid waivers on my part.

*Id.* at 6, ¶ 5. Appellant is an experienced, knowledgeable, sophisticated trader. *See* Brief of Appellant at 2. He has not alleged that he did not understand the provisions of the Client Agreement. In exchange for the privilege of trading on margin (*i.e.*, with funds borrowed from Prudential–Bache), appellant gave appellee the right to protect these loaned funds by closing out his trading positions "whenever" in appellee's discretion it deemed it desirable to do so.

Appellant argues that the agreement must be construed in light of established courses of conduct and the reasonable expectations of the parties. Both appellant and the Prudential–Bache broker handling his account testified in depositions that clients generally were given 24 hours to meet margin calls before their positions were liquidated. *See* J.A. at 77, 80–81. Appellant was given slightly over an hour.

---

**1.** The maximum loss is limited only by the exercise price of the put option sold. If a broker wrote a put option contract entitling the option holder to sell to the broker 1,000 shares of the index at $320.00 per share and the index dropped to zero, the broker's total loss would be $320,000.00. If the broker wrote ten such contracts, his loss would be $3.2 million.

The Client Agreement, however, does not contain a 24–hour notice provision. Rather, the agreement specifically states that no "prior course of conduct or dealings" shall invalidate appellant's waiver of his right to demand any notice of liquidation. Paragraph 5 of the Client Agreement expressly authorized appellee's decision to liquidate appellant's account without notice.

Such provisions are reasonable in the volatile and risky put options market. A brokerage house should not have to risk a nearly unlimited amount of its own funds while waiting 24 hours to see if a client can meet a margin call. Indeed, if Prudential–Bache had waited until the end of the trading day on Friday, October 16, 1987, to close out appellant's positions, the account's losses would have exceeded $200,000.00. *See id.* at 50. For much the same reason, the Eighth Circuit Court of Appeals found a similar provision enforceable in the commodities market context. *See Geldermann & Co., Inc. v. Lane Processing, Inc.,* 527 F.2d 571 (8th Cir.1975).[2]

■ Furthermore, even without reliance on paragraph 5 of the Client Agreement, appellee would be entitled to judgment as matter of law. In general, an individual who opens a brokerage account is responsible to the brokerage house for losses on that account. Appellant seeks to escape that obligation in this case by arguing that appellee acted wrongfully. In liquidating appellant's account, appellee did two things. First, it bought back all of the put option contracts appellant had written. Second, it prevented appellant from further buying or selling on his account until he provided additional funds. Appellant has no legal basis to complain about either of these actions.

By buying back appellant's put option contracts at 10:45 a.m. on Friday rather than waiting until Monday, appellee saved appellant over $65,000.00. *See J.A.* at 50. Appellant cannot avoid a valid debt by arguing that his creditor wrongfully saved him money. He suffered no injury due to the first aspect of appellee's liquidation of his account, and appellee's decision to close out appellant's positions sooner rather than later, given the market conditions, was certainly prudent and reasonable.

As for the second aspect of appellee's conduct, on Friday, October 16, 1987, appellant owed appellee over $100,000.00. As noted above, he was trading exclusively with appellee's money. His argument is essentially that, if appellee had "loaned" him more money by allowing him to trade without investing any more of his own funds, he could have purchased put option contracts, at a cost of $51,000.00, and eliminated his debt. *See J.A.* at 90. This sounds suspiciously like the gambler who is $100,000.00 in debt to the casino arguing that he should not be liable for the debt because if it had just let him borrow another $50,000.00 he would have won the very next hand of poker. As a matter of law, once appellant was in debt to appellee, appellee had no duty, contractual or otherwise, to lend appellant even more money.

## IV.

Appellee's liquidation of appellant's margin account was authorized by contract. Even in the absence of such contractual authorization, appellee would be entitled to summary judgment because appellant's defenses are untenable. The judgment of the district court is therefore AFFIRMED.

---

2. Although quite risky, the commodities market is actually less risky than the put options market because the Chicago Board of Trade closes all trading when a commodity price has increased or decreased by some previously determined daily maximum. *See Geldermann,* 527 F.2d at 576–77. No such limits apply on the New York Stock Exchange. Thus, the need for brokerage houses to protect themselves from adverse market conditions is even stronger in this case than in *Geldermann.*