**MORGAN STANLEY & CO. INCORPORATED, Plaintiff,**

v.

**PEAK RIDGE MASTER SPC LTD o/b/o The Peak Ridge Commodities Volatility Master Fund Segregated Portfolio, Defendant.**

**No. 10 Civ. 8405(ALC).**

United States District Court, S.D. New York.

March 15, 2013.

Brian T. Frawley, Kenneth M. Raisler, Adrienne Abercrombie Harris, Sullivan and Cromwell, LLP, New York, NY, for Plaintiff.

Eric R. Levine, Eric P. Heichel, Stephen Lee Weinstein, Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C., New York, NY, for Defendant.

## MEMORANDUM & ORDER

ANDREW L. CARTER, JR., District Judge.

### I. Introduction

On November 8, 2010, Plaintiff Morgan Stanley & Co. Incorporated ("Morgan Stanley") filed a Complaint against Defendant Peak Ridge Master SPC LTD ("Peak Ridge"). Plaintiff alleges Defendant, an energy hedge fund, breached the contract governing a natural gas futures trading account ("the account") held with Morgan Stanley, causing Plaintiff to terminate the account and seek recovery for the losses incurred. Defendant counterclaimed, arguing Plaintiff breached the contract by wrongfully terminating the account, and Plaintiff's affiliate was unjustly enriched by the sale of the account.

On July 3, 2012, Morgan Stanley and its affiliate, Morgan Stanley Capital Group, Inc. ("MSCG"), filed a Motion to Dismiss Defendant's amended counterclaims. Peak Ridge filed its opposition on August 02, 2012, and Morgan Stanley filed a reply on August 16, 2012. For the reasons discussed below, Morgan Stanley's Motion to

Dismiss is GRANTED in part and DENIED in part,

## II. Background

Peak Ridge held an account with Morgan Stanley between October of 2009 and June of 2010, trading natural gas options and futures. Morgan Stanley served as the Futures Commission Merchant ("FCM") and clearing member for the account, guaranteeing Peak Ridge's trades to the New York Mercantile Exchange ("the exchange") and assuming full responsibility for any losses. The Commodity Futures Customer Agreement ("Customer Agreement") entered into by Morgan Stanley and Peak Ridge on September 4, 2009 established their rights and obligations subject to New York law. Due to the assumption of risk by Morgan Stanley in its capacity as the FCM, the Customer Agreement imposed certain limitations on Peak Ridge's trading. One such limitation was a margin requirement, which obligated Peak Ridge to make minimum deposits into the account to assure its performance. The Customer Agreement permitted Morgan Stanley to compel greater margins than those required by the exchange to protect against intra-day market losses and future fluctuations in the value of the contracts held by the account.

The initial margin requirement Morgan Stanley imposed on Peak Ridge was a 2:1 net asset value ("NAV").[1] In March of 2010, due to some losses in the account, Morgan Stanley raised the margin requirement to 4:1. In early June of 2010, Morgan Stanley raised the margin requirement to 4.5:1 and again to 6:1 in response to a sharp decline in the NAV of the account. Peak Ridge alleges Morgan Stanley never portrayed these increases as

requirements but rather, described them as targets or aspirations. At the close of trading on June 8, the NAV of the account was $11.4 million with a gross market value of the positions in excess of $700 million. On June 9, 2010, Morgan Stanley sent a letter to Peak Ridge, indicating the new margin requirement was 6:1, and Peak Ridge had until the close of business that day to bring the account into compliance. At the close of business on June 9, the account margin was 5.3:1, short of the 6:1 requirement, as confirmed by an email Morgan Stanley received from Peak Ridge.

Morgan Stanley sent written notice of default to Peak Ridge on June 10. After the close of trading that same day, the account was in compliance with the 6:1 margin requirement, and the NAV of the account was just over $15 million. On June 11, Morgan Stanley sent Peak Ridge written notice terminating its access to the account. Morgan Stanley then entered into a series of transactions, trading in the account until June 23, 2010 when it sold the remaining positions, hedges, and cash balance to MSCG. In its counterclaims, Peak Ridge alleges: (1) Morgan Stanley breached the Customer Agreement through its seizure and liquidation of the account; and (2) MSCG has been unjustly enriched by the sale of the account.

Morgan Stanley makes the current motion before the Court pursuant to Rule 12(b)(6), seeking dismissal of Peak Ridge's counterclaims.

## III. Discussion

### A. *Standard of Review*

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows for dismissal if a

---

1. NAV represents the aggregate net value of all the contracts in the account assuming all open positions could be closed at that day's settlement price. This value assumes all positions could be liquidated simultaneously irrespective of volatility, liquidity, or the difficulty of liquidating at that price. (Pl. Mot., p. 2 n.1.)

party fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). When deciding a motion to dismiss, the Court must accept as true all well-pled facts alleged in the Complaint and must draw all reasonable inferences in Plaintiff's favor. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir.2007). Claims should be dismissed when a Plaintiff has not pled enough facts that "plausibly give rise to an entitlement for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, 129 S.Ct. 1937. If the non-moving party has "not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**B. *Breach of Contract Counterclaim***

Peak Ridge's first counterclaim alleges Morgan Stanley breached the Customer Agreement by erroneously declaring the account in default, failing to make a margin call or request for a monetary margin deposit, seizing the account when it was in compliance with the margin requirement, and failing to exercise its liquidation remedies in a commercially reasonable manner. Specifically, Peak Ridge argues a margin call is required before an event of default can be declared under the Customer Agreement, and Morgan Stanley never made a margin call. Even though the account had fallen below the 6:1 margin requirement on June 9, Peak Ridge remedied the deficiency by the close of trading on June 10. Therefore, since the account was in compliance with the margin requirement when the actual seizure occurred on June 11, Morgan Stanley lost its right to pursue certain remedies. Morgan

Stanley also could have traded more judiciously to avoid destroying the value of the account, and its conduct during liquidation was grossly negligent.

i. *The Customer Agreement does not require a separate margin call*

The Customer Agreement sets forth Morgan Stanley's ability to impose margin requirements and the remedies available upon an event of default. The relevant parts state:

**4. *Customer's Events of Default; Morgan Stanley's Remedies.***

 **a. Events of Default.** As used herein, any of the following is an 'Event of Default':

 . . .

 (v) the Customer is in default, or an event of default exists, with respect to any material obligation or liability (including the failure to make a payment on demand or to satisfy margin requirements) arising under any contract or agreement between Morgan Stanley . . . ;

 (vi) the failure by Customer to deposit or maintain margins or to pay required premiums in accordance with Section 6(e) hereof, or otherwise to make payments required by Section 3 hereof;

 . . .

 **b. Remedies.** Upon the occurrence of an Event of Default, Morgan Stanley shall have the right, in addition to any other remedy available to Morgan Stanley at law or in equity, (i) buy, sell or otherwise liquidate any or all open Contracts held in or for the Account (including without limitation, through the making or taking of delivery, the use of exchange for physical transactions, exchange for swaps transactions, block trades, any associ-

ated cash transactions as broker or principal, or any other means): ... (iii) sell any or all of the securities or other property of Customer held by Morgan Stanley and to apply the proceeds thereof to any amounts owed by Customer to Morgan Stanley; ... (vi) take such other or further actions Morgan Stanley, in its commercially reasonable discretion, deems necessary or appropriate for its protection, all without demand for margin and without notice or advertisement and to the full extent permitted under Applicable Law ... In exercising its remedies hereunder, Morgan Stanley may in its sole discretion and without prior notice to the Customer ... (C) close out positions in whole or in part, or limit and/or terminate the right of the Customer to trade in the Account, other than for liquidation; (D) sell Contracts to itself or its affiliates or buy Contracts from itself or its affiliates in arms-length transactions ... Any such action may be undertaken in the discretion of Morgan Stanley in a commercially reasonable manner ... A prior demand or margin call of any kind from Morgan Stanley or prior notice from Morgan Stanley shall not be considered a waiver of Morgan Stanley's right to take any action without notice or demand....

. . .

**6.** *General Agreements.* The parties agree that:

. . .

**e. Original and Variation Margin; Premiums; Other Contract Obligations.** Customer shall perform all obligations attendant to transactions or positions in the Contracts and shall make, or cause to be made, all applicable original margin, variation margin, intra-day margin and premium payments, in such amount, form and subject to such valuation mechanics, as

may be required by Applicable Law or Morgan Stanley. Requests for margin deposits and/or premium payments may, at Morgan Stanley's election, be communicated to Customer orally, telephonically or in writing....

(Frawley Decl., Ex. 1–1, Dkt. No. 31–1.)

■ According to Peak Ridge, Section 6(e) of the Customer Agreement does not allow Morgan Stanley to declare an event of default for failure to meet a margin requirement unless it makes a margin call for a specific dollar amount that would bring the account into compliance first. Peak Ridge's assertion, however, is contrary to the plain text of the Customer Agreement. Section 6(e) clearly states Peak Ridge is required to make margin payments in any amount or form Morgan Stanley dictates. Further, Morgan Stanley can communicate these margin requirements orally, telephonically, or in writing. Once Morgan Stanley has conveyed what the margin requirement is, there is no additional obligation to make a margin call if the account falls out of compliance. Section 4(b), which allows Morgan Stanley to exercise its remedies if the margin requirement is not met "without demand for margin" and "in its sole discretion and without prior notice to the Customer", confirms a margin call is not required before Morgan Stanley can declare an event of default. *See Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (concluding where the parties dispute the meaning of a provision, the task of the court "is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement' " (quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990))).

■ Where, as here, a contract is clear and unambiguous, the parties are bound by the language contained in the docu-

ment, and the Court does not need to turn to extrinsic evidence. *See Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 837 N.Y.S.2d 600, 868 N.E.2d 956 (2007) ("Where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language."); *Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 765 (2d Cir.1984) (citing *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)) (stating if the contract's language is unambiguous and has only one reasonable interpretation, the Court does not need to consider extrinsic evidence of the parties' intent). There is no ambiguity in the language of the Customer Agreement and adopting Peak Ridge's suggested reading would stretch the text past any reasonable interpretation. *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir.1996) ("[N]o ambiguity exists where the alternative construction would be unreasonable."). After Morgan Stanley conveyed the margin requirement through the June 9, 2010 letter, Peak Ridge was obligated to keep the account in compliance without further warning or notice. Once the account fell out of compliance, no subsequent margin call was mandated.

ii. *Morgan Stanley is not obligated to allow Peak Ridge more time to comply with the margin requirement*

■ The June 9, 2010 letter set the new margin requirement at 6:1 and gave Peak Ridge until the close of business that day to bring the account into compliance. At the close of trading on June 9, the account did not meet the margin requirement, forming the basis for Morgan Stanley's declaration of default. Peak Ridge argues Morgan Stanley breached the Customer Agreement by declaring the account in default without adequate notice. It asserts standard industry practice for compliance with new margin requirements is one day.

Due to the volatile nature of the commodities market, FCMs can be responsible to the exchange for risky positions taken by their customers. This assumption of responsibility, in turn, necessitates the ability of FCMs to maintain control over the accounts they guarantee. *See Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*, 794 F.Supp. 1265, 1275–76 (S.D.N.Y.1992) (citing *Sherman v. Sokoloff*, 570 F.Supp. 1266, 1270 n. 14 (S.D.N.Y.1983)) ("The purpose of margin call rules is to protect brokers from the risks associated with insufficiently secured accounts, and to prevent customers from carrying vast exposure in their accounts without adequate capital to cover their positions."); *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 577 (8th Cir.1975) ("Investors ... who have failed to deposit sufficient maintenance margins may have insufficient financial resources to withstand substantial losses on the market and, if so, continued trading on that account is a financial risk for the commission merchant, and ultimately for the commodities exchange....").

Morgan Stanley, in its business discretion, determined Peak Ridge's account had assumed overly risky positions, necessitating an increase in the margin requirement and giving Peak Ridge a limited amount of time to bring the account into compliance. Courts have held that as little as one hour is sufficient notice under similar circumstances. *See Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 190 (7th Cir.1992) ("One-hour notice to post additional margin ... is reasonable where a contract specifically provides for margin calls on options at any time and without notice."); *Prudential–Bache Sec., Inc. v. Stricklin*, 890 F.2d 704, 706–07 (4th Cir.1989) (rejecting a claim that 24–hour notice, which the broker normally gave to customers, was necessary before broker could liquidate an under-

margined account and upholding notice of one hour as in accordance with the customer agreement); *see also Modern Settings, Inc. v. Prudential–Bache Sec. Inc.,* 936 F.2d 640, 645 (2d Cir.1991) (upholding a provision of a customer agreement allowing Defendant-broker to liquidate an undermargined account without notice). Peak Ridge is a sophisticated trader that controlled an account with a NAV of over $11 million in June of 2011. Peak Ridge cannot reasonably expect it was entitled to additional time to continue assuming risky positions while its account was undermargined. *See Stricklin,* 890 F.2d at 707 ("A brokerage house should not have to risk a nearly unlimited amount of its own funds while waiting 24 hours to see if a client can meet a margin call.").

Additionally, Peak Ridge is unable to point to any provision of the Customer Agreement that entitles it to at least one day's notice and an opportunity to cure. *See Fesseha v. TD Waterhouse Investor Servs., Inc.,* 193 Misc.2d 253, 747 N.Y.S.2d 676, 679 (N.Y.Sup.Ct.2002) (finding where the customer agreement does not state a party has a right to notice and an opportunity to cure an undermargined account, the court will not assume these requirements are implied in the contract), *aff'd,* 305 A.D.2d 268, 761 N.Y.S.2d 22 (1st Dep't 2003). To the contrary, Section 4(b) gives Morgan Stanley unfettered discretion to require margin requirements are met without demand and without prior notice to the account holder. Such broad authority, which was specified in the contract and is necessary to stabilize an unpredictable market, has not been compromised by the courts. *See Cauble v. Mabon Nugent & Co.,* 594 F.Supp. 985, 990 (S.D.N.Y.1984) (holding margin call notice requirements can be waived through agreements giving brokers broad authority to liquidate an account if it becomes undermargined.); *Omnivest Inc. v. Elders Futures, Inc.,* 157 A.D.2d 528, 530–31, 550 N.Y.S.2d 6 (App.

Div. 1st Dep't 1990) (finding less than a full day adequate to demand compliance with a margin requirement based on the FCM's broad discretion in the customer agreement).

iii. *Bringing the account into compliance after missing the margin requirement has no effect on Morgan Stanley's ability to exercise its remedies*

■ Peak Ridge's next argument contends it was able to bring the account into compliance with the 6:1 margin requirement by the close of business on June 10, so Morgan Stanley was estopped from seizing the account. Specifically, since Morgan Stanley delayed the exercise of its remedies, even for a day, it lost the right to seize the account since Peak Ridge cured the default in the intervening period. This argument, for which Peak Ridge offers no legal support, is another assertion that directly contradicts the Customer Agreement. Section 10(h) states, "Neither party's failure to exercise, delay in exercising, or partial exercise of any contractual right . . . on any occasion or series of occasions is or implies a waiver of any contractual right . . . and does not preclude any future exercise, delayed exercise or partial exercise of any contractual rights hereunder." (Frawley Decl., Ex. I–1, Dkt. No. 31–1); *see also Modern Settings,* 936 F.2d at 645 ("[T]he mere fact that Securities did not always exercise its contractual right to liquidate margin accounts without notice did not amount to a waiver of that right.").

The assertion that Morgan Stanley was estopped from seizing the account is baseless for other reasons as well. The account did not meet the 6:1 margin requirement on June 9; this alone was sufficient for Morgan Stanley to declare an event of default under the Customer Agreement. Subsequent activity in the account does

not prohibit Morgan Stanley from pursuing remedies for the missed margin requirement. *See Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 839 (11th Cir.1988) (concluding even if the remaining positions were fully margined and the outstanding margin calls for previously-liquidated positions were fully satisfied, "an initial margin call is not cancelled by either subsequent market movement or liquidation of the position which created the initial margin call"). Peak Ridge is not afforded a grace-period to comply with its contractual obligations unless Morgan Stanley elects to give it one. In this instance, Morgan Stanley declined to do so.

iv. *Morgan Stanley's liquidation and sale of Peak Ridge's account*

■ Section 4(b) authorizes Morgan Stanley to take any action it deems necessary to protect itself, including liquidating an account and selling it to an affiliate, so long as Morgan Stanley acts in a commercially reasonable manner. Peak Ridge argues Morgan Stanley did not exercise its remedies in a commercially reasonable manner by: (1) denying Peak Ridge access to the account and failing to keep Peak Ridge informed of the account's status; (2) destroying the value of the account in a self-serving manner; and (3) dropping barriers that would shield information about the account from MSCG.

■ The first argument, asserting Peak Ridge was denied access to the account and was not kept informed of the liquidation, is easily rejected. There is no provision in the Customer Agreement that gives Peak Ridge these rights.[2] Turning

to the second argument, Peak Ridge alleges that after seizing the account, Morgan Stanley could have traded differently and more judiciously so as not to destroy the value of the positions. Morgan Stanley is not required, however, to choose the most beneficial trading strategy for Peak Ridge, as the right to liquidate is for the benefit of Morgan Stanley in protecting itself against high-risk positions. *See Cheng v. Worldco, L.L.C.*, 1 Misc.3d 903(A), No. 118075/03, 2003 WL 22964397, at *3 (N.Y.Sup.Ct. Nov. 26, 2003) ("The first obligation … was to liquidate the security positions to reduce Worldco's exposure, and not to liquidate in such a manner as to generate a profit for petitioner, especially since petitioner's actions were in violation of the agreement he signed."); *Merrill Lynch Futures, Inc. v. Sands*, 143 N.H. 507, 511–12, 727 A.2d 1009 (N.H.1999) ("Merrill Lynch was not obligated to liquidate the defendant's account for his protection because Merrill Lynch's right to liquidate is solely for its own protection."). Nor will the Court second-guess Morgan Stanley's trading based on hindsight. *Capital Options Invs., Inc. v. Goldberg Bros. Commodities, Inc.*, No. 88 C 2073, 1990 WL 180583, at *6 (N.D.Ill. Nov. 5, 1990), *aff'd*, 958 F.2d 186 (7th Cir.1992) ("We are not equipped to second-guess, especially with the benefit of hindsight, the business judgments of professional traders and brokers regarding the risks associated with any given position or the volatility and direction of any future market movements.").

■ The most compelling argument to support the breach of contract counter-

---

2. Section 4(b) of the Customer Agreement provides, "In the event Morgan Stanley's position would not be jeopardized thereby, Morgan Stanley will make commercially reasonable efforts under the circumstances to notify Customer prior to taking any such action." (Frawley Decl., Ex. 1–1, Dkt. No. 31–1.) This provision refers to making reasonable efforts to notify the account holder before Morgan Stanley exercises its remedies in an event of default. It does not go so far as to entitle the account holder to be consulted during the liquidation process.

claim is Morgan Stanley did not act in a commercially reasonable manner throughout the liquidation and sale of the account to MSCG by engaging in "a two-phased approach ... that was designed to maximize value to MSCG." (Am. Ans.¶ 113.) Peak Ridge contends Morgan Stanley intended to sell the account to MSCG from the time of seizure, so that MSCG could realize the profits. (*Id.*) Prior to June 11, Morgan Stanley had informational barriers in place to deny MSCG traders access to the positions in the account. (*Id.* ¶ 118.) During the period from June 11 to June 23, Morgan Stanley gave control of the trading activity to Joel Stier, a trader at MSCG who was simultaneously trading on his own book. (*Id.* ¶¶ 114–15.) At that time, Morgan Stanley also dropped informational barriers, allowing MSCG traders to have full access to information about the account. (*Id.* ¶ 121.)

According to Peak Ridge, Mr. Stier's continuous trading on his book while in a position to trade for Morgan Stanley created a conflict of interest, whereby Mr. Stier traded in the Peak Ridge account to benefit his book and other traders at MSCG. (*Id.* ¶ 126.) He shared details of his trading on behalf of Morgan Stanley with colleagues and supervisors at MSCG, including Sara Menker, Brian Sestak, and Lev Kazarian. (*Id.* ¶¶ 124–25.) Moreover, Mr. Stier allegedly engaged in self-dealing on June 15, 2010 and June 21, 2010 by executing trades in the account by private transaction where the opposite party was his own or another MSCG account. (*Id.* ¶ 127.) Mr. Stier determined the quantity and price for these trades, which was more favorable to MSCG than the traded price on the exchange that day. (*Id.*)

Once undesirable positions in the account were liquidated, Peak Ridge contends Morgan Stanley only considered MSCG as a buyer for the remaining positions without seeking any alternative bids

or making any effort to arrange a sale to a third-party. (*Id.* ¶ 140.) There were no negotiations on price with MSCG, and the sale was not documented in writing. (*Id.* ¶¶ 141, 143.) Morgan Stanley also agreed to pay MSCG a liquidity premium of $14 million for the sale of the account, (*Id.* ¶ 150.) After the sale, the account's positions were transferred to Mr. Stier's trading book. (*Id.* ¶ 152.) By the end of 2010, Mr. Stier's book showed profits of approximately $30 million. (*Id.* ¶ 53.)

The Customer Agreement requires Morgan Stanley to act in a commercially reasonable manner when liquidating a customer's account, and it also requires that any sales to its affiliates, including MSCG, be done in an arms-length transaction. Courts have found that commercial reasonableness, which is a term commonly used in conjunction with the Uniform Commercial Code, is often a fact-intensive inquiry. *See Leigh Co. v. Bank of N.Y.,* 617 F.Supp. 147, 153 (S.D.N.Y.1985) ("It is true that the determination of commercial reasonableness is usually a factual determination best made by the trier of fact[.]"); *Bank of China v. Chan,* 937 F.2d 780 (2d Cir.1991) (finding an issue of fact precluded summary judgment on commercial reasonableness); *Holland Am. Cruises, N.V. v. Carver Fed. Sav. & Loan Ass'n,* 60 A.D.2d 545, 400 N.Y.S.2d 64, 65 (1st Dep't 1977) (holding whether the Defendant acted in accordance with "reasonable commercial standards applicable to the business" presented an issue of fact).

Taking its factual assertions as true and drawing all inferences in its favor, Peak Ridge has pled sufficient facts to state a counterclaim for breach of contract with respect to Morgan Stanley's liquidation of the account by Mr. Stier. Peak Ridge benefits from the rational inference that Mr. Stier assumed a conflict of interest by managing the liquidation of the account for

Morgan Stanley while simultaneously trading in his own book at MSCG as a competitor in the same market. *See e.g. Madaro Trading Corp. v. Nat'l Bank of N. Am.*, 64 A.D.2d 977, 408 N.Y.S.2d 806, 807 (2d Dep't 1978) (stating a question of fact existed as to whether a sale of assets was commercially reasonable where a bank foreclosed on a debtor and transferred assets to a third-party when the principal shareholder of the debtor was also a shareholder of the third-party and was an active participant in the negotiations preceding the transfer). Further questions are raised by the information sharing that occurred between Mr. Stier and his colleagues at MSCG and the self-dealing trades in the account. Peak Ridge bears the burden of presenting evidence demonstrating the commercially reasonable standard under these circumstances, *Leigh Co.*, 617 F.Supp. at 153, but has alleged sufficient facts to state a claim.

The same factual allegations also support the argument that the sale to MSCG was not done in an arms-length transaction. Like the inquiry into commercial reasonableness, determining whether an arms-length transaction occurred requires an examination of the facts and circumstances surrounding the deal. *See Application of Putnam Theatrical Corp.*, 16 A.D.2d 413, 416, 228 N.Y.S.2d 93 (4th Dep't 1962) (suggesting courts view transactions in light of the facts and circumstances surrounding them to determine whether they were at arms-length). Mr. Stier was responsible for trading in the account during Morgan Stanley's dump of certain positions to drive down the account's value. The account was then sold to MSCG, whereby Mr. Stier acquired the remaining positions. Mr. Stier benefited from control over the account prior to the sale, which another buyer with no relationship to Morgan Stanley would not have received. The allegations that Morgan Stanley paid a substantial liquidity premi-

um without seeking third-party buyers for the residual positions strengthen this claim.

The remaining arguments regarding the breach of contract counterclaim are without merit and as such, will not be addressed. Peak Ridge's first counterclaim for breach of contract survives dismissal only with respect to the allegations that Morgan Stanley did not act in a commercially reasonable manner during the liquidation of the account by Mr. Stier and that the sale of the account to MSCG was not an arms-length transaction. The allegations that Morgan Stanley could have traded more judiciously or differently after seizing the account are not part of the surviving claim and are DISMISSED for the reasons set forth above.

v. *Damages available for the breach of contract counterclaim*

 It has been clearly established in New York that damages should be measured by loss sustained or gain prevented at the time of breach in contract cases alleging a wrongful seizure of securities. *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 262 (2d Cir.2002) ("New York courts are clear that breach of contract damages are to be measured from the date of the breach."); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971); *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 197 (2d Cir.2003) (rejecting the conversion measure of damages, which is the securities' value at the time of the conversion or their highest intermediate value between notice of the conversion and the time when reentry into the market would be both warranted and desired, in breach of contract cases). "New York courts 'have rejected awards based on what 'the actual economic conditions and performance' were in light of hindsight.'" *Lucente*, 310

F.3d at 262 (quoting *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 826 (2d Cir.1990)). Therefore, if Morgan Stanley breached the Customer Agreement, damages should be ascertained by the value of what a willing buyer would pay a willing seller for the positions on the date of the breach. Damage calculations put forth by Peak Ridge that do not follow this formulation are rejected as contrary to the binding precedent in *Lucente* and *Oscar Gruss*.[3]

■ Morgan Stanley also points out that the Customer Agreement contains a liability limitation provision. Section 5 states,

> Morgan Stanley shall be responsible for such loss, liability, damage or expense that is directly caused by its gross negligence or willful misconduct. In no event will Morgan Stanley be liable to Customer for consequential, incidental, punitive or special damages hereunder, including without limitation, damages alleged on the basis of lost profits or lost assets, including income-producing assets.

(Frawley Decl., Ex. 1–1, Dkt. No. 31–1.) These provisions are valid and enforceable under New York law. *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 449–50 (S.D.N.Y.2003) ("The New York Court of Appeals has declared that '[a] limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor.'" (quoting *Metro. Life Ins. Co. v. Noble Lowndes*

*Int'l, Inc.*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504, 507 (1994))); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 318 (S.D.N.Y.2002). Nevertheless, a liability limitation will be set aside when the conduct as issue involves gross negligence or willful misconduct. *Kalisch–Jarcho, Inc. v. City of N.Y.*, 58 N.Y.2d 377, 384, 461 N.Y.S.2d 746, 448 N.E.2d 413 (1983); *Gross v. Sweet*, 49 N.Y.2d 102, 106, 424 N.Y.S.2d 365, 400 N.E.2d 306 (1979).

■ Peak Ridge argues Morgan Stanley's conduct after seizing the account amounts to gross negligence or willful misconduct, which cannot be insulated by the Customer Agreement. In *Net2Globe*, the court described the type of conduct that would lead to nullifying a liability limitation provision:

> [Several decisions] illustrate the far higher mark at which New York courts place the bar and, also, the effects of wrongful conduct sufficient as a matter of law to nullify a limitations of liability clause in contract—demanding nothing short of in a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts.

273 F.Supp.2d at 454; *see also Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667(LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007) ("When the setting is, as here, a contract between two sophisticated parties 'the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional

---

**3.** In its Amended Answer and Counterclaims, Peak Ridge pleads, "The value of the Comm. Vol. Fund Account ... at the time of seizure was at least $15 million. As a result of Morgan Stanley's breaches of contract, the CommVol Fund has been damaged in an amount to be determined at trial, but not less than $15 million." (Am. Ans. ¶¶ 172–73.) The val-

ue of $15 million represents the NAV of the account on or around June 10, 2010. Whether the NAV calculation is an accurate representation of what a willing buyer would pay a willing seller on the date of the alleged breach is a factual determination for the jury. *See supra* n. 1.

wrongdoing.'" (quoting *Indus. Risk Insurers v. Port Auth. of N.Y. and N.J.*, 387 F.Supp.2d 299, 305 (S.D.N.Y.2005))). A party acting in their own economic self-interest is not enough to constitute gross negligence or willful misconduct. *See Metro. Life*, 84 N.Y.2d at 439, 618 N.Y.S.2d 882, 643 N.E.2d 504 (holding proof that "defendant's repudiation of the Agreement was motivated exclusively by its own economic self-interest" is insufficient to show willful misconduct); *DynCorp*, 215 F.Supp.2d at 318 ("*Metropolitan Life* is authoritative, and it holds that an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power.").

■ Here too, Peak Ridge's allegations are insufficient to plead gross negligence or willful misconduct. As the Court noted above, the allegations demonstrate Morgan Stanley may have engaged in conduct surrounding the liquidation and sale of the account that was self-serving and aimed at maximizing its profits. This conduct could be deemed commercially unreasonable, but commercial reasonableness requires significantly less culpability than "a compelling demonstration of egregious intentional misbehavior." Considering Mr. Stier may have engaged in self-dealing with respect to liquidating some of the positions, MSCG traders may have had access to information about the account which should have been protected, and MSCG may have bought the remaining positions on suspiciously favorable terms, there are no facts that amount to malice, recklessness, or callous indifference on the part of Morgan Stanley. As such, the unambiguous liability limitation in the Customer Agreement permits Peak Ridge to recover only actual damages. Any allegations seeking recovery for consequential, incidental, punitive, or special damages, including lost profits, are DISMISSED.

## C. *Unjust Enrichment Counterclaim*

The unjust enrichment counterclaim is based on the same facts as the arguments previously discussed—namely, the circumstances surrounding the sale of the account to MSCG. Peak Ridge brings this claim against MSCG, who was not a party to the Customer Agreement, contending MSCG unjustly benefited from the purchase of its account by receiving and profiting from the remaining positions after Mr. Stier dumped the undesirable ones. On the other hand, Morgan Stanley and MSCG argue the Customer Agreement forecloses Peak Ridge's ability to recover under a theory of unjust enrichment.

■ New York state courts, federal courts in our district, and the Second Circuit have held the existence of a valid and enforceable contract precludes an unjust enrichment claim relating to the subject matter of the contract. *See e.g. Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."); *Golub Assocs. Inc. v. Lincolnshire Mgmt., Inc.*, 1 A.D.3d 237, 767 N.Y.S.2d 571, 572 (1st Dep't 2003) ("Nor is a claim predicated on unjust enrichment cognizable where the parties' rights and obligations are governed by a valid and enforceable contract."); *Krause v. Forex Exch. Mkt., Inc.*, 12 Misc.3d 1192(A), No. 05–601854, 2006 WL 2271274, at *4 (N.Y.Sup.Ct. Mar. 1, 2006) ("[T]here is no basis for the quasi-contractual claim of unjust enrichment, inasmuch as there was a valid contract in existence."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F.Supp.2d 275, 311 (S.D.N.Y.1998) (finding no unjust enrichment claim can lie where the sale and liquidation of securities

were governed by contract); *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 964 (2d Cir.1998) (stating it is a well-settled principle of New York law that a valid and enforceable contract precludes recovery under a theory of unjust enrichment for subject matter governed by the contract). "This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract." *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F.Supp. 1308, 1333–34 (S.D.N.Y.1997) (citing *Graystone Materials, Inc. v. Pyramid Champlain Co.,* 198 A.D.2d 740, 604 N.Y.S.2d 295, 296 (3d Dep't 1993)). Still, the Second Circuit has found this principle is not absolute. *U.S. E. Telecomms., Inc. v. U.S. W. Commc'ns Servs., Inc.,* 38 F.3d 1289, 1298 (2d Cir.1994) ("The principle of *Clark–Fitzpatrick,* while broad, is subject to exceptions.").

Peak Ridge relies on two decisions to argue an exception to *Clark–Fitzpatrick* should apply to our case. In *Hughes v. BCI Int'l Holdings,* 452 F.Supp.2d 290 (S.D.N.Y.2006), despite the existence of a valid contract, the court held Plaintiffs could maintain an unjust enrichment claim against Defendants, a third-party to the contract who wrongfully obtained Plaintiffs' assets. The assets were intended for the company in which Plaintiffs were investing, and Defendants' actions deprived Plaintiffs of the value of their investment. *Id.* at 304. The court reasoned that the existing contract did not dictate Plaintiffs' rights vis-à-vis Defendants, who diverted Plaintiffs' assets from the company, so the contract should not preclude Plaintiffs from proceeding in equity against Defendants, *Id.* "[P]laintiffs' binding agreement ... should not preclude plaintiffs from proceeding in equity.... To hold otherwise would subvert the 'logic of [this] equitable doctrine ... which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from [the culpable] parties.' " *Id.* (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 754 F.Supp. 37, 41 (S.D.N.Y.1991)).

The second case, *Howe v. Bank of N.Y. Mellon,* 783 F.Supp.2d 466 (S.D.N.Y.2011), follows the same analysis as *Hughes.* In *Howe,* the court allowed Plaintiff-bondholder's unjust enrichment claim to stand against a co-issuer of trust preferred securities. Plaintiff alleged the sale of the securities was in violation of the indenture contract, to which the co-issuer was a non-signatory. *Id.* at 485–86. Defendant, a party to the contract, "breached the Indenture when it sold the TruPS [trust preferred securities], and Plaintiff can cognize a claim that Bimini [the non-signatory co-issuer] caused, aided and abetted ... breach of the Indenture." *Id.* at 486, Since the indenture did not set forth Plaintiff's rights with respect to the co-issuer, Plaintiffs were permitted to proceed in equity against the co-issuer. *Id.*

 The Court finds the existence of the Customer Agreement bars Peak Ridge's unjust enrichment claim under the facts of this case. While the Customer Agreement does not set forth Peak Ridge's rights vis-à-vis MSCG, it directly covers the same subject matter Peak Ridge alleges as the basis for its unjust enrichment claim—the sale of the account by Morgan Stanley to MSCG was not done in a commercially reasonable manner through an arms-length transaction. Therefore, Peak Ridge has a remedy at law through a breach of contract claim, which necessarily extinguishes recovery for the same underlying conduct through a quasi-contract claim. *See In re Chateaugay Corp.,* 10 F.3d 944, 958 (2d Cir.1993) ("[T]he successful assertion of its [Appellant's] contractual right ... is fatal to any quasi contractual claim,"). Although MSCG may have benefited from the sale of the ac-

count, that alone is not enough, particularly where MSCG assumed no obligation to ensure the sale was fair to Peak Ridge. *See Metro. Elec. Mfg. Co. v. Herbert Const. Co., Inc.,* 183 A.D.2d 758, 583 N.Y.S.2d 497, 498 (2d Dep't 1992) (determining Plaintiff-manufacturer's sole remedy was for breach of contract against the subcontractor and precluding equitable recovery against the owner or general contractor where they assumed none of the subcontractor's contractual obligations). The circumstances here do not facilitate the application of *Hughes* and *Howe* or departing from *Clark–Fitzpatrick.*

Accordingly, Peak Ridge's second counterclaim against MSCG for unjust enrichment is DISMISSED in its entirety.

## IV. Conclusion

For the reasons explained above, Counterclaim Defendants' Motion to Dismiss the amended counterclaims is **GRANTED** in part and **DENIED** in part.

**SO ORDERED.**