PROCESS AMERICA, INC., Plaintiff,

v.

CYNERGY HOLDINGS, LLC,
et al., Defendants.

No. 12 Civ. 772(BMC).

United States District Court,
E.D. New York.

Signed July 30, 2014.

Filed July 31, 2014.

Mitchell C. Shapiro, Diana St. Louis, Elie B. Gold, Peter Alfred Basso, Shapiro Tamir Law Group PLLC, New York, NY, for Plaintiff.

Michael Constantine Marsh, Jennifer Cohen Glasser, Stacy J. Rodriguez, Akerman Senterfitt, Miami, FL, Scott Michael Kessler, Kathlyn Moran Schwartz, Susan F. Balaschak, Akerman Senterfitt LLP, New York, NY, for Defendants.

### DECISION AND ORDER

COGAN, District Judge.

This case is before the Court on Cynergy's motion *in limine*—initially styled as one for summary judgment—to limit Process America's damages pursuant to § 4.6 of the ISO Agreement. That section provides as follows:

4.6 Damages *In no event will any party be liable for any special, incidental, consequential or punitive damages of any nature or for any reason whatsoever regardless of the form or action, whether in contract, tort, or otherwise even if advised of that possibility. Except for the liability arising from gross negligence, recklessness, or willful misconduct, the total cumulative liability of Cynergy Data in the aggregate for damages arising from any breach of this Agreement or for any other claims under this Agreement, shall not exceed an* amount equal to the lesser of (i) fees derived by Cynergy Data attributable to

this Agreement if this Agreement has been in effect for less than 4 months, or (ii) *fees derived by Cynergy Data attributable to this Agreement during the last 4 months of this Agreement, measured as of the date the liability accrues.*

(Emphasis added.)

Section 4.6 consists of two operative phrases: the first limits both parties to their actual damages, and the second places an absolute cap on Cynergy's liability. The Court has already ruled on the record that the first clause clearly limits both parties to their actual damages.

At issue here is the second clause, limiting Cynergy's "total cumulative liability ... for damages arising from any breach" of the Agreement to four months of Cynergy's fees. Cynergy calculates the amount of fees it derived in the last four months of the Agreement as totaling approximately $300,000, significantly less than the $3.1 million in residuals that Process America claims to be owed by Cynergy.[1]

Section 4.6 is clear and unambiguous. The parties stipulated to this point in their Joint Pretrial Order, although the Court would reach this conclusion in any event. Section 4.6 states in plain terms that Cynergy's cumulative liability for breach of the Agreement is limited to four months of its fees.

 Under New York law, parties to a contract may agree to limit the liability that the other may recover from a breach of contract. *See Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994). A party "may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made. Where a

---

1. The Court makes no finding as to whether either party's calculations are accurate; this is an issue to be resolved at trial.

contract provides that damages for breach shall not be recoverable beyond a specified sum, it is obvious that the risk of loss beyond that sum is being assumed by the promisee." *Id.* (quoting 5 Corbin, *Contracts,* § 1068, at 386).

Process America advances several arguments to avoid the application of § 4.6. The first is that enforcing the limitation of liability in § 4.6 would conflict with this Court's decision of April 30, 2014, which held that Cynergy breached the ISO Agreement by terminating residual payments without providing Process America with the contractually-required notice and opportunity to cure. According to Process America, the April 30, 2014 decision established its entitlement to $ 3.1 million in improperly withheld residuals, either as the "law of the case" or under a theory of collateral estoppel.

This argument is without merit. The April 30 decision clearly addressed only liability, and not damages. The Court made no findings whatsoever as to the amount of damages that Process America could recover.

█ Next, Process America argues that enforcing § 4.6 would render § 6.4 of the ISO Agreement superfluous, violating the interpretative canon that a contract be interpreted to give effect to all of its provisions. As discussed in the April 30 decision, § 6.4 provides that Process America was entitled to receive residual payments "as long as Cynergy Data is deriving revenue from any merchant, unless the agreement is terminated by Cynergy Data due to a material breach of the Agreement by [Process America]."

There is no contradiction between § 6.4 and § 4.6, because only § 4.6 addresses

the question of damages in the event of a breach. The Court has already held, in the April 30 decision, that that Cynergy did not fulfill its obligations under § 6.4 by terminating residual payments without properly terminating the Agreement "due to a material breach." Section 6.4 says nothing about the damages Cynergy would owe if it breached. Instead, it is most reasonable to look to § 4.6—the section entitled "damages"—to determine the parties' agreement as to damages. Indeed, although it purports to "harmonize" sections 6.4 and 4.6, Process America's argument is actually that the Court should simply ignore § 4.6. It provides no principled reason for doing so.[2]

█ The Court now turns to Process America's more substantial argument, which is that Cynergy's breach falls within the carve-out in § 4.6 for "gross negligence, recklessness, or willful misconduct," and therefore is not subject to the limitation of liability.

The New York Court of Appeals has held that a similar limitation of liability excluding gross recklessness or willful misconduct applied only to "truly culpable, harmful conduct, not merely intentional nonperformance of the Agreement motivated by financial self-interest." *Noble Lowndes Int'l,* 84 N.Y.2d at 438, 618 N.Y.S.2d 882, 643 N.E.2d 504. This holding is consistent with the general principle in contract law that intentional breaches of contract do not carry heavier penalties than inadvertent nonperformance. *Id.* at 435, 618 N.Y.S.2d 882, 643 N.E.2d 504. District courts in the Second Circuit have described the *Noble Lowndes* decision as "authoritative," and applied it to bar claims that mere intentional nonperform-

---

**2.** As the Court finds § 4.6 unambiguous, there is no need to consider Process America's argument that any ambiguities in the Agreement must be construed against Cynergy, the drafter of the form contract to which the parties agreed.

ance of a contract can constitute "willful misconduct." *See Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F.Supp.2d 532, 545 (S.D.N.Y.2013); *DynCorp v. GTE Corp.*, 215 F.Supp.2d 308, 318 (S.D.N.Y.2002).

Process America is correct that at least one subsequent New York decision observed that "the Court of Appeals did not intend economic self-interest to be applied as an expansive principle to excuse all manner of misconduct." *Banc of Am. Sec. LLC v. Solow Bldg. Co. II, L.L.C.*, 47 A.D.3d 239, 247, 847 N.Y.S.2d 49 (1st Dep't 2007). In *Banc of America Securities*, the defendant landlord had demanded payment of $ 6 million to conduct a review of the plaintiff's proposed modifications, a review that the defendant was already required to carry out under the lease. The Appellate Division found this to constitute "willful misconduct," and therefore not within the limitation of liability, because the landlord did "not even pretend [that the demand for the fee was] authorized under the lease," or was reasonable. *Id.* at 249, 847 N.Y.S.2d 49. The Appellate Division distinguished *Lowndes*, describing the defendant's intentional breach in that case as "an act squarely grounded in the defendant's contractual rights" because "[t]he option to breach a contract and pay damages is always available, even where the breaching party had no intention of performing its obligations when it entered into the agreement." *Id.* at 248, 847 N.Y.S.2d 49.

I agree with the courts that have criticized this decision by the Appellate Division. *See Five Star Development Resort Communities, LLC v. iStar RC Paradise Valley, LLC*, No. 09 Civ.2085, 2012 WL 4119561, at *5 (S.D.N.Y. Sept. 18, 2012) ("To the extent that *Banc of America Securities* is read to suggest that an intentional and opportunistic contract breach, without more, is grounds for non-enforcement of an exculpatory clause, it is inconsistent with state law as established by *Metropolitan* Life."). Describing the outright abandonment of a contract as an "act squarely grounded in [a party's] contractual rights" appears a contradiction in terms.

Regardless, *Banc of America Securities* helps Process America little. It is worthwhile at this point to recall the highly technical nature of Cynergy's breach. In the April 30 decision, the Court held that Process America had breached the ISO Agreement by maintaining its Chargeback Reduction Initiative Program (the "CRIP"), through which Process America held merchant funds in violation of the relevant Visa and MasterCard rules. Despite Process America's breach, however, Cynergy failed to give the contractually-mandated notice and opportunity to cure in the form required before terminating the Agreement and Process America's residual payments. It was not that Cynergy failed to give any notice; it was that the notice did not comply with the technical requirements of the Agreement.

Unlike the defendant in *Banc of America Securities*, Cynergy attempted to invoke contractual provisions in seeking to terminate the Agreement. Cynergy's termination letter stated that Process America's retention of merchant funds was a violation of the credit card rules, and therefore, the Agreement. Again, this Court agreed that the CRIP was a breach. Cynergy, facing pressure from its sponsor bank, purported to terminate the Agreement and residual payments immediately, citing provisions of the Agreement which it believed supported its position. This Court ultimately disagreed, and after a close reading of the contract, held that the termination was procedurally improper.

Even viewing the facts most favorably to Process America, this record hardly sup-

ports an inference that Cynergy's breach—which, again, is not necessarily its termination of the Agreement and Process America's residual payments, but its failure to provide notice and opportunity to cure before doing so—was intentional, much less that it would qualify as "willful misconduct." Process America has submitted no evidence indicating that Cynergy did not believe it was justified in terminating without providing a cure period, or that Cynergy was acting out of anything but its own financial self-interest. Indeed, the financial self-interest underlying Cynergy's actions is quite apparent: Harris Bank, Cynergy's sponsor, had told Cynergy that the CRIP was a breach of the credit card rules and that Cynergy was required to terminate Process America as an ISO.

Most of the evidence that Process America has submitted post-dates Cynergy's termination of the ISO Agreement, and thus has only limited relevance to the question of whether Cynergy was acting maliciously when it failed to provide the proper notice and cure period. Other evidence predates the termination, but concerns the parties' dispute before the bankruptcy court over the EP/ISO reserve in 2010, rather than Cynergy's decision to terminate without opportunity to cure. The only evidence that Process America has submitted that might contribute to a finding of willful misconduct is a statement that a Cynergy lawyer, Sheila Corvino, allegedly made to a Process America lawyer, Alyssa Klausner, in which the former allegedly "went so far as to admit . . . that she and New Cynergy were withholding the residuals from Process America in order to 'break' Process America." But Pro-

cess America provides no further detail about the content of this alleged statement or the context in which it was made. Such a vague statement, even when combined with Process America's other evidence, is insufficient to make the required "compelling demonstration of egregious intentional misbehavior evincing extreme culpability." *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 454 (S.D.N.Y.2003).

■ Process America also argues that at the time it entered the Agreement, its executives lacked experience in the credit-card processing business and were not represented by counsel, and that enforcing § 4.6 would lead to "a harshly uneven allocation of economic power." *Noble Lowndes*, 84 N.Y.2d at 438, 618 N.Y.S.2d 882, 643 N.E.2d 504. This is essentially an argument that § 4.6 is both procedurally and substantively unconscionable, although not framed in such terms.

Process America has provided no evidence that would permit the Court to find § 4.6 unconscionable. Although Process America's executives apparently were not represented by counsel,[3] nevertheless, "[t]here is a presumption of conscionability when the contract is between businessmen in a commercial setting." *Xerox Corp. v. Graphic Mgmt. Servs. Inc.*, 959 F.Supp.2d 311, 321 (W.D.N.Y.2013). Section 4.6 is conspicuous and written in clear language, and states the limitation on Cynergy's "total cumulative liability" in no uncertain terms. Process America has provided the Court with little more than conclusory assertions by its executives that they would not have agreed to the

---

**3.** This is the first time in this litigation that Process America has taken the position that it was not represented by counsel in negotiating the ISO Agreement. Indeed, Process America's initial letter opposing Cynergy's motion

*in limine* advanced much the same argument—that Cynergy and Process America had unequal bargaining power at the time they entered the ISO Agreement—but stated that Process America "may have had a lawyer."

contract if they understood that § 4.6 would limit Cynergy's liability in exactly the way the provision states that it would. That is insufficient to show that the provision is unconscionable, especially in the context of a commercial contract like this one.

■ Nor does the fact that Process America's actual damages significantly exceed the limit imposed by § 4.6 render that provision unenforceable. "[I]f contracting parties agree to a limitation-of-liability provision, it will be enforced unless unconscionable, even if it leaves a non-breaching party without a remedy." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 821, 988 N.Y.S.2d 527 (2014). Here, enforcing § 4.6 does not leave Process America without a remedy: Process America can still recover an amount equal to Cynergy's fees in the four months preceding termination. That this remedy does not make Process America entirely whole is a risk that Process America assumed under the Agreement.

**SO ORDERED.**