**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**January 2017 Term**

_____

**No. 15-1122**

_____

**FILED**

**April 24, 2017**

**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**BLACKROCK CAPITAL INVESTMENT CORPORATION and
52nd STREET ADVISORS LLC,
Defendants Below, Petitioners,**

**v.**

**JERRY FISH; WILLIAM FISH; and
FLORA FISH, as Administratrix of the
Estates of James Eugene Fish and Jeffrey Scott Fish;
RICHARD T. SWAIN, CATHY MAJORIS, and
MEGAN SCHLOTTER SWAIN, as Co-Administrators of the
Estate of Steven M. Swain; and
DAVID SCOTT WILLIAMS and RUTH WILLIAMS,
Plaintiffs Below;
AL SOLUTIONS, INC.; and
TREMONT ASSOCIATES, LLC,
Defendants Below; and
TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,
Intervenor Below,
Respondents.**

_____

**Appeal from the Circuit Court of Hancock County
The Honorable Ronald E. Wilson, Judge
Civil Action Nos. 11-C-88 and 11-C-90**

**AFFIRMED**

_____

**Submitted: January 25, 2017
Filed: April 24, 2017**

Jeffrey A. Holmstrand, Esq.
Grove, Holmstrand & Delk, PLLC
Wheeling, West Virginia

Tiffany R. Durst, Esq.
Nathaniel D. Griffith, Esq.
Pullin, Fowler, Flanigan,

**Counsel for the Petitioners**

Brown & Poe, PLLC
Morgantown, West Virginia
Counsel for Respondent
AL Solutions, Inc.

Robert P. Fitzsimmons, Esq.
Clayton J. Fitzsimmons, Esq.
Fitzsimmons Law Firm PLLC
Wheeling, West Virginia
Mark Colantonio, Esq.
M. Eric Frankovitch, Esq.
Carl A. Frankovitch, Esq.
Frankovitch, Anetakis, Colantonio
and Simon
Weirton, West Virginia
Counsel for the Plaintiffs Below

JUSTICE KETCHUM delivered the Opinion of the Court.

CHIEF JUSTICE LOUGHRY dissents and reserves the right to file a separate opinion.

JUSTICE WALKER dissents and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1. "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

2. "A circuit court's entry of summary judgment is reviewed *de novo*." Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994).

3. "A circuit court's entry of a declaratory judgment is reviewed *de novo*." Syllabus Point 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995).

4. This Court reviews a circuit court's interpretation of a contract *de novo*.

Justice Ketchum:

In this appeal from the Circuit Court of Hancock County, we examine the equitable doctrine of unconscionability. Before the circuit court, a subsidiary company sought a declaratory judgment against its parent companies. The subsidiary challenged three management agreements by which the parent companies managed, controlled and participated in the affairs of the subsidiary.

The subsidiary company claimed that two clauses in the agreements were unconscionable. One clause said the parent companies could never be liable to the subsidiary; the other clause required the subsidiary to indemnify the parent companies for all legal and liability costs. The subsidiary company asserted the parent companies unilaterally imposed the clauses without giving the subsidiary any meaningful choice, and asserted that the clauses were oppressive and unjust. The circuit agreed and, in an order dated October 16, 2015, declared that the two challenged clauses were unconscionable and unenforceable.

One of the parent companies now appeals. As we discuss below, we find no error in the circuit court's declaratory judgment order ruling the clauses unconscionable.

## I.
## FACTUAL BACKGROUND

In December 2010, an explosion and fire killed three workers at a processing plant in New Cumberland, West Virginia. The plant processed powdered titanium and zirconium, metals that are pyrophoric and "liable to ignite spontaneously on exposure to

1

air."[1]  Moreover, industry safety guides say that water should never be sprayed on these metals if they catch fire; the titanium and zirconium will dissociate water into oxygen and hydrogen gas, and the hydrogen will then explode.[2]  Prior to the fire, a water-based fire suppression system was installed in the processing plant.

This appeal centers on three agreements to manage the processing plant that were executed four years before the fire, in December 2006.  These management agreements involved three corporate parties: Tremont, Blackrock, and the subsidiary they created, AL Solutions.

The first corporate party, respondent Tremont Associates, LLC ("Tremont"), was a broker that connected buyers and sellers of businesses.  Tremont often took an ownership stake in the businesses for its efforts.  Tremont had no employees and just two owners: Troy Kenyon and Henry Goddard.

In mid-2006, Tremont learned that a company (called Jamegy, Inc.) was seeking to sell its titanium and zirconium processing business, including the West Virginia processing plant.  Tremont then searched for investors to buy the processing business.

---

[1] *Oxford Dictionary of English* (2012).

[2] Material Safety Data Sheets ("MSDS") in the record state that titanium and zirconium are "pyrophoric and may ignite in powder form."  An MSDS for titanium provides that, in case of a fire, "Do not extinguish with water. . . . The application of water to burning titanium can cause an explosion due to the evolution of hydrogen gas."  Another MSDS says zirconium "should be considered a dangerous fire hazard, or a dangerous explosion hazard if the mix is moist or hydrated. . . . Do not spray water on burning zirconium. . . . If fire starts . . . the initial fire may be followed by an explosion . . . caused by the steam and hydrogen generated within the burning mass."

2

The investors Tremont settled upon are the second party. Petitioner Blackrock Kelso Capital Corporation is an investment fund; petitioner Blackrock Kelso Capital Advisors, LLC, managed that investment fund.[3] These two companies operated jointly and seamlessly in the purchase of the West Virginia processing plant, and we – like the parties – refer to them singularly as "Blackrock." It is important to know the names of two employees of Blackrock: Marshall Merriman and Stephen Sachman.

On December 6, 2006, Tremont and Blackrock (the parent companies) came together and incorporated the third party, AL Solutions, Inc. (the subsidiary).[4] The stated function of AL Solutions was to buy and operate the West Virginia processing plant. The documents of incorporation fixed the number of directors at three. Three directors were then appointed: Mr. Kenyon (from Tremont), and Mr. Merriman and Mr. Sachman (from Blackrock). Those three directors then anointed Mr. Goddard (from Tremont) as president of AL Solutions. Mr. Goddard later testified that the decision to appoint him as president was "dictated . . . by the guys at Blackrock."

---

[3] On March 6, 2015, Blackrock Kelso Capital Corporation became Blackrock Capital Investment Corporation. Blackrock Kelso Capital Advisors, LLC, became 52nd Street Capital Advisors LLC, and allegedly no longer serves as the investment advisor to Blackrock Capital Investment Corporation.

[4] At the same time, Tremont and Blackrock also created Tygem Holdings, Inc., to be nothing more than a shell company to hold all of the shares of AL Solutions. However, Tygem is not a direct party to these proceedings, and our discussion omits Tygem.

On December 29, 2006, three management agreements were executed between AL Solutions on the one side (identified in the agreements as "the company"), and Tremont and Blackrock on the other (identified as "the management parties").[5] Each management agreement required Tremont and Blackrock to provide "certain services" to AL Solutions. The three agreements were:

- The "Management Services Agreement," under which Tremont and Blackrock agreed to provide "certain agreed upon management and financial services" to AL Solutions;

- The "Advisory Services Agreement," which required the provision of "certain advisory services" to AL Solutions; and

- The "Transaction Fee Agreement," requiring the provision of "certain consulting and advisory services" to AL Solutions.

In exchange for providing "certain services" to AL Solutions, Tremont and Blackrock were entitled to collect fees. In an e-mail, Mr. Goddard said these fees were important to Tremont because "management fees keep the lights on over here."

The "certain services" Tremont and Blackrock were required to provide are nowhere defined, in the agreements or elsewhere. In discovery, individuals from Tremont and Blackrock all claimed in some fashion that the agreements made them responsible for providing AL Solutions with "management services" or "guidance and assistance." However, they were also of the opinion that safety issues at the processing plant were not

---

[5] These agreements also involved Tygem as a part of "the company."

4

within the scope of the agreements. For instance, Mr. Sachman testified that safety was "completely outside the purview" of the Management Services Agreement, but conceded, "I can't point you to a specific clause within the agreement that explicitly says that."

Within each of these management agreements are two clauses that are the focus of this appeal. The first is an indemnification clause that requires AL Solutions to indemnify Tremont and Blackrock "from any and all losses, claims, damages and liabilities" arising out of the agreements or "the rendering of any other advice or performance of any other services[.]"[6] The second clause is titled "no liability," and says

---

[6] As an example of an indemnification clause, paragraph 6 of the Management Services Agreement provides:

> 6. Indemnification. The Company [AL Solutions] shall:
>
> (a) indemnify the Management Parties [Tremont and Blackrock], each Related Person of each Management Party, and each of the partners, members, stockholders, directors, officers, employees, agents and controlling persons of each Management Party or any of its Related Persons (collectively, the "Management Related Parties"), to the fullest extent lawful, from and against any and all losses, claims, damages and liabilities directly or indirectly caused by, related to, based upon, or arising out of the engagement of the Management Parties pursuant to this Agreement, or the rendering of any other advice or performance of any other services by any Management Related Party for the Company or any of its subsidiaries; and
>
> (b) promptly reimburse each Management Related Party for all costs and expenses (including reasonable counsel fees and expenses), as incurred, in connection with the investigation of, preparation for, or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not any Management Related Party is a party and whether or not

5

that Tremont and Blackrock cannot be liable to AL Solutions "in contract or tort or otherwise" for anything arising out of the agreements.[7]

At a meeting on December 29, 2006, lawyers employed by Tremont and Blackrock presented the three management agreements to Mr. Goddard. No lawyer was hired to represent the interests of AL Solutions, either in the negotiation or the execution of the agreements. Mr. Goddard signed the three agreements as "president" of AL Solutions; he then signed the same documents as the "managing director" of Tremont. The chief operating officer of Blackrock (Michael Lazar) signed, and then the board of directors for AL Solutions approved the agreements.

---

> such claim, action or proceeding is initiated or brought by or on behalf of the Company and whether or not such claim, action or proceeding results in any liability.

[7] As an example of a "no liability" clause, paragraph 7 of the Advisory Services Agreement provides:

> 7. No Liability. The Company [AL Solutions] agrees that no Management Related Party [Tremont and Blackrock] shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or any of its affiliates, or any of the security holders or creditors of the Company or any of their respective affiliates or any other Person directly or indirectly caused by, related to, based upon, or arising out of (i) the engagement of the Management Parties pursuant to this Agreement, the performance of the services to be performed hereunder, or the rendering of any other advice or performance of any other services by any Management Related Party or (ii) any Outside Activities.

After signing the three management agreements, and on the same day, Mr. Goddard stepped down as president of AL Solutions. Mr. Goddard admitted in a deposition that his sole purpose in being appointed as president of AL Solutions for less than one month was to "just sign[] some papers to set the shell up."

During the period that Tremont and Blackrock were negotiating and consummating the December 2006 purchase of the titanium and zirconium business, several fires or explosions occurred at the processing plant. In July 2006, a worker died in a fire. Fires also occurred on December 21, 2006, and February 7, 2007. Testimony suggested no one from Tremont or Blackrock investigated the cause of these fires. Instead, even though safety documents said water should never be used on titanium and zirconium fires, a water deluge system was installed. Despite the fire suppression system, at least three more fires occurred at the processing plant.[8]

---

[8] An official 2014 report by the U.S. Chemical Safety and Hazard Investigation Board ("CSB") noted the recurring fires at the processing plant:

> Before the 2010 incident, the New Cumberland facility had experienced two fatal explosions involving the ignition of metal dust. From 1993 until the December 2010 incident, the New Cumberland VFD [Volunteer Fire Department] responded to at least seven fires at AL Solutions. . . . The CSB learned that several other fires occurred at the New Cumberland facility that did not result in a fire department response. In fact, almost all employees . . . reported to CSB investigators that they had witnessed one or more fires in the production building.

U.S. Chemical Safety and Hazard Investigation Board, *AL Solutions, Inc., New Cumberland, WV, Metal Dust Explosion and Fire* (July 16, 2014).

7

On December 9, 2010, another explosion and fire occurred at the processing plant. Three AL Solutions employees were killed in the fire: brothers James Eugene Fish and Jeffrey Scott Fish died inside the plant; Steven M. Swain's skin was burnt off inside the plant but he escaped and collapsed outside, only to die of his burn injuries four days later. A contractor, David Scott Williams, escaped but received burns. Employees Jerry Fish and William Fish – brothers of decedents James and Jeffrey Fish – suffered emotional distress when they witnessed the fire that killed their brothers.

The circuit court noted that, over a 15-year period culminating in December 2010, fires and explosions had killed nearly 20% of the workforce at this plant.

## II.
## PROCEDURAL BACKGROUND

The plaintiffs (the injured workers and the family members of the deceased workers) sued defendants AL Solutions, Tremont, and Blackrock. The plaintiffs asserted that, through powers conferred by the three management agreements, Tremont and Blackrock actively managed, controlled, and participated in the daily affairs of AL Solutions.[9] The plaintiffs alleged that, acting together, the three defendants recklessly

---

[9] For instance, in discovery, the plaintiffs learned that Blackrock hired a computer forensic expert to investigate whether a sales employee of AL Solutions had misused e-mails; Blackrock had the $20,000 bill paid by AL Solutions.

8

operated and managed the West Virginia processing plant and that they knowingly failed to comply with federal, state, and industry safety standards.[10]

When AL Solutions answered the plaintiffs' complaints, it also asserted a cross-claim for contribution and/or indemnification against its parent corporations, Tremont and Blackrock. Tremont and Blackrock countered by asserting claims against AL Solutions pursuant to the indemnification and no-liability clauses in the three management agreements. Tremont and Blackrock alleged that AL Solutions was contractually obligated to pay for their attorney fees and costs defending against the plaintiffs' case and to indemnify them from liability.

AL Solutions subsequently amended its cross-claim against Tremont and Blackrock and added a request for a declaratory judgment. AL Solutions asked the circuit court to declare that the indemnification and no-liability clauses in the management agreements were unconscionable and unenforceable. On November 18, 2014, AL Solutions filed a motion for partial summary judgment regarding the unconscionability of those two clauses.

In an order dated October 16, 2015, the circuit court granted partial summary judgment in favor of AL Solutions. Applying West Virginia law to the contracts, the circuit

_____

[10] The plaintiffs' complaints sought compensatory and punitive damages, and asserted various causes of action including: (1) "deliberate intention" under W.Va. Code §§ 23-4-2(d)(2)(i) and (2)(ii); (2) negligence and recklessness; (3) intentional or reckless infliction of emotional distress; (4) negligent infliction of emotional distress; and (5) strict liability for working with inherently dangerous materials.

9

court found the indemnification and no-liability clauses procedurally and substantively unconscionable.

Blackrock now appeals the circuit court's partial summary judgment order.[11]

## III.
## STANDARD OF REVIEW

"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[12]

We review a circuit court's entry of an order granting summary judgment, as well as an order granting a declaratory judgment, *de novo*.[13] Additionally, this Court

---

[11] Tremont did not file an appeal, and on January 7, 2016, the circuit court authorized Tremont's trial counsel to withdraw from the case.

Additionally, it has come to the Court's attention that Blackrock reached a settlement with the plaintiffs. *See* Blackrock Capital Investment Corp., Current Report (Form 8-K) (October 6, 2016) ("Blackrock Capital Investment Corporation . . . together with 52nd Street Capital Advisors LLC . . . have reached an agreement in principle with the Plaintiffs to settle the actions for $17,500,000[.]"). Despite this settlement, a dispute appears to remain between AL Solutions and Blackrock concerning their respective rights to contribution or indemnification from the other.

[12] Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

[13] Syllabus Point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). ("A circuit court's entry of summary judgment is reviewed *de novo.*"); Syllabus Point 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995) ("A circuit court's entry of a declaratory judgment is reviewed *de novo.*").

reviews a circuit court's interpretation of a contract *de novo*.[14]  The term "*de novo*" means

"Anew; afresh; a second time."[15]  "We have often used the term '*de novo*' in connection

with the term 'plenary.' . . .  Perhaps more instructive for our present purposes is the

definition of the term 'plenary,' which means '[f]ull, entire, complete, absolute, perfect,

unqualified.'"[16]

We therefore give a new, complete and unqualified review to the parties'

arguments and the record before the circuit court.  Our goal is to determine if there is any

genuine issue of fact about the unconscionability of the two clauses, or if any inquiry

concerning the facts is desirable to clarify the application of the law.

# IV.
## ANALYSIS

Blackrock's appeal of the circuit court's order boils down to two assertions

of error.  Blackrock's central argument is that the circuit court ignored a choice of law

provision within each management agreement that required the application of New York,

not West Virginia, law.  When construed under New York principles of contract law,

---

[14] *W.Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 796 S.E.2d 574, 578 (W.Va. 2017) ("Moreover, to the extent that our resolution of this appeal necessitates our review of contractual issues, 'we apply a *de novo* standard of review to [a] circuit court's interpretation of [a] contract.'") (citations omitted).

[15] *Frymier-Halloran v. Paige,* 193 W.Va. 687, 693, 458 S.E.2d 780, 786 (1995) (quoting *Black's Law Dictionary* 435 (6th ed. 1990)).

[16]*State ex rel. Clark v. Blue Cross Blue Shield of W.Va., Inc.*, 203 W.Va. 690, 701, 510 S.E.2d 764, 775 (1998) (quoting *Black's Law Dictionary* 1154 (6th ed.1990)).

Blackrock argues that the indemnification and no-liability clauses are conscionable and fair. Blackrock's second argument challenges the manner in which the circuit court entered its ruling, asserting the circuit court ruled on an incomplete record and thereby deprived it of due process.

We address and, as explained below, reject Blackrock's two contentions.

## A. Unconscionability in General

The first argument we address is Blackrock's assertion that the indemnification and no-liability clauses are conscionable and fair. Blackrock contends the circuit court erred in finding the clauses to be unconscionable, in part because it failed to interpret the clauses under New York law.

The circuit court found the indemnification clause and the no-liability clause unconscionable after applying West Virginia law. However, the management agreements contain a choice of law provision providing that they would "be governed and construed in accordance with the internal laws of the State of New York[.]" This Court has recognized "the presumptive validity of a choice of law provision"[17] and found that such a provision is "not automatically void[.]"[18]

---

[17] *Manville Pers. Injury Settlement Tr. v. Blankenship*, 231 W.Va. 637, 644, 749 S.E.2d 329, 336 (2013). *Accord*, *W.Va. CVS Pharmacy, LLC v. McDowell Pharmacy, Inc.*, 796 S.E.2d 574 (W.Va. 2017).

[18] *Gen. Elec. Co. v. Keyser*, 166 W.Va. 456, 461 n.2, 275 S.E.2d 289, 292 n.2 (1981).

12

Blackrock argues the circuit court erred in applying West Virginia law. We agree with Blackrock on this point, and hold that the circuit court should have assessed the unconscionability of the two clauses under New York law, not West Virginia law. Nevertheless, New York's unconscionability jurisprudence is structured almost identically to West Virginia's. Under a plenary review, when we apply New York's contract law to the record, the outcome of this case remains unchanged: the indemnification clause and no-liability clause in the management agreements are unconscionable.

Under New York law, like under West Virginia law, an unconscionable agreement is one that "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms."[19] "[A]n unconscionable contract is one such as no man in his senses and not under a delusion would make on the one hand, and as no honest or fair man would accept, on the other."[20] The doctrine of unconscionability is rooted in equitable principles,

[19] *Mandel v. Liebman*, 100 N.E.2d 149, 152 (N.Y. 1951). *Cf.* Syllabus Point 12, in part, *Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250, 261 (2011), *cert. granted, judgment vacated sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012) ("*Brown I*") ("The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written.").

[20] *Mandel*, 100 N.E.2d at 152 (quotations omitted). *Cf. McGinnis v. Cayton*, 173 W.Va. 102, 113, 312 S.E.2d 765, 776 (1984) (quoting *Hume v. United States,* 132 U.S. 406, 411 (1889) ("It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains.").

is flexible, and is "intended to be sensitive to the realities and nuances of the bargaining process[.]"[21]

Like West Virginia, New York law holds that a party alleging unconscionability must generally show that "the contract was both procedurally and substantively unconscionable when made – i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."[22]  "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se."[23]  A court assesses the existence of overall unconscionability under a sliding scale between procedural and substantive

---

[21] *State v. Avco Fin. Serv. of N.Y. Inc.*, 406 N.E.2d 1075, 1078 (N.Y. 1980). *Cf.* Syllabus Point 12, in part, *Brown I* ("The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.").

[22] *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988) (quotations and citations omitted).  *Cf.* Syllabus Point 20, *Brown I* ("A contract term is unenforceable if it is both procedurally and substantively unconscionable.  However, both need not be present to the same degree.  Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa").

Unlike West Virginia, several New York cases have found exceptional circumstances "where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman*, 534 N.E.2d at 829.

[23] *Simar Holding Corp. v. GSC*, 928 N.Y.S.2d 592, 595 (2011).

unconscionability: "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa."[24]

One court summarized New York's doctrine of unconscionability this way:

> In determining the conscionability of a contract, no set weight is to be given any one factor; each case must be decided on its own facts. However, in general, it can be said that procedural and substantive unconscionability operate on a "sliding scale"; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa. While there may be extreme cases where a contractual term is so outrageous and oppressive as to warrant a finding of unconscionability irrespective of the contract formation process such cases are the exception. Generally, there must be a showing of both a lack of a meaningful choice and the presence of contractual terms which unreasonably favor one party. . . . Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party. The doctrine of unconscionability, with its emphasis on the contract-making process, is really an expression of, rather than an exception to, this principle. By focusing on the manner in which a contract is entered into and the status of the parties, the doctrine is designed to insure freedom of contract and not to negate it.[25]

As another court said, the doctrine of unconscionability ensures that contracts are "the subject of calm and deliberate adjustment[.]"[26]

---

[24] *State v. Wolowitz*, 468 N.Y.S.2d 131, 145 (1983).

[25] *Wolowitz*, 468 N.Y.S.2d 131, 145 (1983) (citations omitted).

[26] *Hydraulic Power Co. of Niagara Falls v. Pettebone-Cataract Paper Co.*, 191 N.Y.S. 12, 18 (App. Div. 1921).

15

Applying New York law, we now examine the circuit court's finding that the two clauses in the management agreements were procedurally and substantively unconscionable.

## B. Procedural unconscionability

New York courts say that weighing procedural unconscionability requires an examination of the contract formation process and the parties' alleged lack of meaningful choice. "The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power."[27]

The circuit court examined the contract formation process and found that the two clauses in the management agreements were adopted in a procedurally unconscionable manner. The circuit court found it undisputed that attorneys working for Blackrock and Tremont drafted the three management agreements; no lawyer was hired to represent the interests of AL Solutions in the negotiation or the execution of the agreements. Even though AL Solutions had no lawyer, the circuit court found that AL Solutions was compelled to pay the attorney's fees incurred by Tremont during the transaction.

---

[27] *Gillman*, 534 N.E.2d at 828. *Cf.* Syllabus Point 17, in part, *Brown I* ("Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction.").

The circuit court also found it undisputed that, at the time the parties executed the management agreements, the board of directors for AL Solutions was comprised solely of principals from Blackrock and Tremont. That board then appointed one of the two owners of Tremont, Mr. Goddard, as president of AL Solutions. Hence, when Mr. Goddard signed the three management agreements on behalf of both Tremont and AL Solutions, and the board approved those agreements, there was no real and voluntary meeting of the minds. The circuit court even found that Mr. Goddard was not "consciously aware" that the agreements contained the no-liability clauses. Put simply, AL Solutions did not bargain for the indemnification and no-liability clauses. The circuit court found the clauses were a result of Blackrock and Tremont "effectively contracting with themselves through their exclusive control, authority, and dominion" over AL Solutions, primarily to "insulate themselves from any and all liability."

Blackrock does not dispute the circuit court's findings. Instead, Blackrock presents a scattershot argument that the circuit court misinterpreted the legal effect of these facts. For instance, Blackrock asserts that contracts between "businessmen in a commercial setting" are presumed to be conscionable,[28] or that the failure of an individual to consult a lawyer before a contract is executed is not enough to warrant a finding of

---

[28] *See Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F.Supp.3d 259, 263 (E.D.N.Y. 2014) ("Although Process America's executives apparently were not represented by counsel, nevertheless, '[t]here is a presumption of conscionability when the contract is between businessmen in a commercial setting.'").

17

procedural unconscionability.[29] Blackrock does not explain how these principles apply in this case, particularly where the facts present a corporation that lacks counsel or any other independent representation, and where there was no "businessman" acting in an arms-length manner on AL Solution's behalf.

Blackrock's theory is that the contract-execution process which the circuit court deemed oppressive is actually fair, because it is consistent with traditional principals of corporate governance. Much of Blackrock's argument centers on Mr. Goddard and the fact that he acted on both sides of the transaction, signing as president of AL Solutions and as managing director of Tremont. Blackrock asserts Mr. Goddard's dual role was not unfair because it is a common feature of corporate practice. Blackrock contends that parent corporations routinely enter into agreements with subsidiary shell companies, and when they do so their officers necessarily sign contracts on behalf of both entities.[30]

Blackrock argues that officers who sign agreements on behalf of both the parent company and the subsidiary do not violate any fiduciary duty when they do so.

---

[29] *See Reach Music Pub., Inc. v. Warner/Chappell Music, Inc.*, 2014 WL 5861984, at *7 (S.D.N.Y. Nov. 10, 2014) ("[T]here is 'no requirement in the law that consultation with a lawyer must occur in order to render a contractual obligation enforceable.' Many agreements are entered into without counsel on one side, the other, or both.")(citation omitted).

[30] *See*, *e.g.*, *Vendetti v. Fiat Auto S.p.A.*, 802 F. Supp. 886, 893 (W.D.N.Y. 1992) ("It is not uncommon for a parent company and its subsidiaries to have common directors and/or owners."); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("It has been established that overlapping officers and directors are 'intrinsic to the parent-subsidiary relationship,' and that they are not determinative as to whether the subsidiary is a 'mere department' of the parent.").

18

Citing to general principals of corporate law, Blackrock argues that, "The weight of authority holds that a parent corporation owes no fiduciary duties to its wholly-owned subsidiary."[31]  Much of Blackrock's argument is founded upon *Anadarko Petroleum Corporation v. Panhandle Eastern Corporation*, where the Delaware court stated:

> It is a basic principle of Delaware General Corporation Law that directors are subject to the fundamental fiduciary duties of loyalty and disinterestedness. Specifically, directors cannot stand on both sides of the transaction nor derive any personal benefit through self-dealing.  However, in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.[32]

We note, however, that the court in *Anadarko Petroleum* focused solely upon the fiduciary duties of corporate directors; it did not consider the doctrine of unconscionability.  Moreover, the trial court in *Anadarko Petroleum* explicitly avoided considering the fairness of the contracts at issue.  The trial court said, "For purposes of this decision it is not necessary to evaluate the fairness of the Disputed Agreements.  Suffice it to say that at least one of the individual defendants conceded that he did not think

---

[31] *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 902, 917 (W.D. Ky. 2007).

[32] *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. 1988) (citations omitted).  *See also Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 832 (S.D.N.Y. 1996) ("[T]hose who operate the parent company owe no fiduciary duties to the wholly owned subsidiary, and even when the parent company announces a proposed spin-off of the subsidiary, the directors of the parent and the directors of the subsidiary owe no fiduciary duties to the soon-to-be-independent subsidiary's prospective stockholders.").

Panhandle could have obtained Anadarko's approval of the agreements if Anadarko had been an independent company."[33]

Furthermore, it is a traditional principle of corporate governance that the law jealously regards a contract between a parent corporation and its subsidiary and it is voidable for unfairness. It is well-settled law that "[a] contract between parent-subsidiary corporations, even with identical officers, is not void, but only voidable for fraud, or unfairness."[34]

> [A] contract or business transaction between two corporations having all or a part of their directors or officers in common is not inherently invalid and is not void because of the relationship alone, but is voidable only. However, it is generally held that a contract between two corporations having one or more common directors or officers is jealously regarded by the law, and once such a transaction is questioned it is thereafter subjected to the closest scrutiny by the courts because of this relationship, and is voidable if found to be unfair even though there be no taint of fraud. The rule is deemed necessary to the end that in the absence of arm's length bargaining the scales may not be unfairly tipped to one side or the other even through mistake or inadvertence.[35]

---

[33] *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 521 A.2d 624, 627 (Del. Ch. 1987).

[34] *Am. Motors Corp. v. Wisconsin Dep't of Revenue*, 219 N.W.2d 300, 305 (Wis. 1974).

[35] *Colorado Mgmt. Corp. v. Am. Founders Life Ins. Co. of Denver*, 359 P.2d 665, 668 (Colo. 1961). *Accord Tower Hill-Connellsville Coke Co. of W.Va. v. Piedmont Coal Co.*, 64 F.2d 817, 823 (4th Cir. 1933) ("Transactions between corporations having interlocking directorates, the fairness and good faith of which transactions are challenged, are jealously regarded by the law, and those who would sustain them must show their entire fairness.").

In the instant case, AL Solutions never argued that the principals of Tremont or Blackrock were violating any fiduciary duties, whether to shareholders or anyone else. Instead, it has asserted continuously and strenuously that the disputed clauses were unfairly imposed upon AL Solutions, to its exclusive detriment and solely to the benefit of Blackrock (and Tremont). Put succinctly, we do not think AL Solutions would have approved the two clauses in the agreements if AL Solutions had been an independent company.

Examining the extensive record presented by the parties, we find no error in the circuit court's conclusion that the indemnification and no-liability clauses were adopted in a procedurally unconscionable manner. Tremont and Blackrock disrespected the corporate form, the corporate structure, of AL Solutions. The actions of Tremont and Blackrock may be routine in the business world, but that does not make those actions fair and conscionable. By exercising complete dominion over AL Solutions in the execution of the indemnification and no-liability clauses, Tremont and Blackrock disregarded the independent corporate identity of AL Solutions.

To determine whether an agreement is procedurally unconscionable, "we must examine the contract formation process for a lack of meaningful choice."[36] AL Solutions clearly had no meaningful choice in the contract formation process. This was not an arms-length negotiation between competent, independent business-persons. No individual or attorney represented AL Solutions in the negotiation or drafting of the

---

[36] *In re Lawrence*, 23 N.E.3d 965, 976-77 (N.Y. 2014).

21

indemnification or no-liability clauses; no attorney was present to protect the interests of AL Solutions, while AL Solutions was forced to pay the attorney fees for Tremont; and the person who signed on behalf of AL Solutions, Mr. Goddard, admitted he did not know all the terms of the agreements.

We have given a plenary review to the record, and weighed the contract formation process under New York law. We find no error in the circuit court's determination that the two clauses were adopted in a procedurally unconscionable manner.

### C. Substantive unconscionability

Under New York contract law, weighing substantive unconscionability "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged."[37] The courts of New York have held that "[s]ubstantive elements of unconscionability appear in the content of the contract per se[.]"[38] "[C]ontract provisions that are oppressive, unjust, and unreasonably deprive a party of the benefits of his or her bargain are substantively

---

[37] *Gillman*, 534 N.E.2d at 829. *Cf.* Syllabus Point 19, in part, *Brown I* ("Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement.").

[38] *Emigrant Mortg. Co., Inc. v. Fitzpatrick*, 945 N.Y.S.2d 697, 699 (App. Div. 2012) (quoting *Matter of Friedman*, 407 N.Y.S.2d 999, 1008 (1978)).

unconscionable."[39]   "Examples of unreasonably favorable contractual provisions are virtually limitless[.]"[40]

The circuit court carefully examined the contents of the indemnification clause and the no-liability clause in the context of the three management agreements. The circuit court found that both clauses were unreasonably favorable to Tremont and Blackrock, and therefore substantively unconscionable.

The three management agreements required Tremont and Blackrock to provide unspecified "certain services."  For example, the circuit court noted the Management Services Agreement required Tremont and Blackrock to provide "certain management and financial services," and in return they would receive a substantial annual fee "for performing a service that is wholly undefined under the contract."  However, because of the no-liability and indemnification clauses, the circuit court found Tremont and Blackrock "would be immune from liability for their conduct," and would have a claim for indemnity, even for their own wrongful conduct to third parties. The circuit court found the "harsh effect of these provisions is that [Blackrock and Tremont] had no responsibility to adequately perform under the agreement."

The circuit court found that, if the indemnification and no-liability clauses were found to be enforceable, Tremont and Blackrock "could be insulated from all liability

[39] *Day Op of N. Nassau, Inc. v. Viola*, 16 Misc. 3d 1122(A), *7, 847 N.Y.S.2d 901 (Sup. Ct. 2007).

[40] *Wolowitz*, 468 N.Y.S.2d at 145.

23

even if they would have refused to perform under the contract. In other words, [Blackrock] and Tremont could have refused to perform any management services, financial services, or advisory services, and [AL Solutions] would have been without recourse." Because of this, the circuit court concluded that the indemnification and no-liability clauses are "a perfect example of substantive unconscionability."

The circuit court also found the two clauses lacked any mutuality of obligation. The indemnification clause requires AL Solutions to indemnify Tremont and Blackrock; the no-liability clause provides that Tremont and Blackrock would never be liable AL Solutions. There is no reciprocal provision regarding liability or indemnity for AL Solutions. AL Solutions must indemnify and defend Tremont and Blackrock even if AL Solutions initiates the proceeding or suit. The clauses have the practical effect of preventing AL Solutions from suing Tremont or Blackrock for any purpose, including breach of the agreements. Hence, the circuit court found the clauses were completely one-sided and unreasonably favorable to one side.

Taken together, the circuit court concluded that the two clauses were substantively unconscionable.

Blackrock concedes that the indemnification and no-liability clauses are, by their very own terms, broad enough to hold Blackrock harmless for negligence in the performance of its contractual services or even an intentional breach of the agreements. However, Blackrock claims that "[u]nder New York law, parties to a contract may agree

24

to limit the liability that the other may recover from a breach of contract."[41] "A party 'may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.'"[42]

AL Solutions responds by pointing out that, under New York law, indemnification clauses and no-liability clauses have never been declared *per se* conscionable and fair. Just the opposite is true. "'No damage' clauses are not always absolute and they must be strictly construed against the party seeking to avoid liability."[43] New York courts have said that contracts must have "at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract," and any contract clause modifying or limiting remedies "in an *unconscionable* manner is subject to deletion and in that event the remedies made available . . . as if the stricken clause had never existed."[44] Accordingly, "It follows that contractual limitations upon remedies are generally to be

---

[41] *Process Am., Inc. v. Cynergy Holdings, LLC*, 35 F.Supp.3d 259, 260 (E.D.N.Y. 2014).

[42] *Id.* (quoting *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504 (1994).

[43] *Vanderlinde Elec. Corp. v. City of Rochester*, 388 N.Y.S.2d 388, 391 (1976). *See also Ippolito-Lutz, Inc. v. Cohoes Hous. Auth.*, 254 N.Y.S.2d 783, 784 (1964) ("An exculpatory clause of this nature is not always absolute. It must be construed strictly against the party seeking exemption from liability because of his own fault.").

[44] *Wilson Trading Corp. v. David Ferguson, Ltd.*, 244 N.E.2d 685, 687 (N.Y. 1968) (quoting Uniform Commercial Code, § 2-719, Official Comment 1).

enforced *unless unconscionable*."[45]    Stated differently, "Contractual limitations on remedies are generally enforced unless entered into under circumstances evidencing fraud or unconscionability."[46]

This Court is cognizant that under New York law, and the law of most other jurisdictions, it is the rare case where a contract between two commercial parties is found to be unconscionable. This Court has found similarly, holding that contract law "permits courts to protect parties from grossly unfair, unconscionable bargains; it does not permit courts to protect commercial litigants from stupid or inefficient bargains willingly and deliberately entered into."[47]

Nevertheless, unconscionability must be assessed based on the particular facts and circumstances of each case. We have examined the indemnification and no-liability clauses and we find them both unreasonably favorable to Blackrock. Applying equitable principles of New York law, these two clauses are outrageous and oppressive. The clauses prevent AL Solutions from suing Blackrock, even if Blackrock refused to perform any of its "certain services." The presence of these clauses in the three management agreements does not reflect the freedom of contract, but rather shows that AL Solutions was a hapless pawn destined for sacrifice on the altar of corporate law.

---

[45] *Wilson Trading Corp.*, 244 N.E.2d at 687 (emphasis added).

[46] *Edwards v. N. Am. Van Lines*, 513 N.Y.S.2d 895, 897 (1987).

[47] *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W.Va. 486, 497, 729 S.E.2d 808, 819 (2012).

26

In summary, we find no error in the circuit court's conclusion that the two clauses were substantively unconscionable.

### D. Overall unconscionability

New York law requires a modicum of both procedural and substantive unconscionability in order for a contract provision to be unenforceable. "[P]rocedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa."[48] Elements of procedural and substantive unfairness abound in the indemnification and no-liability clauses, and we have no difficulty finding a lack of any bargained-for exchange between the parties. The circuit court was therefore correct in its determination that the two clauses were oppressive, unfair, and unconscionable, and therefore unenforceable.[49]

---

[48] *Wolowitz*, 468 N.Y.S.2d at 145.

[49] Blackrock offers a one-paragraph alternative to voiding the two clauses. It asserts that the circuit court should have declared all three management agreements void in their entirety. Blackrock's argument consists of four sentences and no citation to legal authority. A "skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Judges are not like pigs, hunting for truffles buried in briefs. Furthermore, this Court has adhered to the rule that although we liberally construe briefs in determining issues presented for review, issues mentioned only in passing but not supported with pertinent authority, are not considered on appeal." *State v. Kaufman*, 227 W.Va. 537, 555 n.39, 711 S.E.2d 607, 625 n.39 (2011) (citations, quotations, and ellipses omitted). We refuse to consider this argument.

**E. Due Process**

Blackrock's second argument is that it had insufficient opportunity to respond to AL Solutions's motion for partial summary judgment. Blackrock contends the circuit court violated its due process rights and wholly precluded Blackrock from offering evidence or arguments countering the assertions of AL Solutions that the two clauses were unconscionable.

AL Solutions filed its motion for partial summary judgment on November 18, 2014. The circuit court entered its order 333 days later, on October 16, 2015. Between those dates, the parties vigorously litigated two other motions that were intertwined with the summary judgment motion.

The first motion entangled with the summary judgment motion came from the plaintiffs. The insurer for AL Solutions deposited the liability insurance policy limits with the circuit court.[50] The plaintiffs moved to distribute those funds. Counsel for Tremont and Blackrock objected because depletion of the insurance policy funds would impair their ability (under the management agreements) to recover indemnification from AL Solutions.

The second entangled motion was Blackrock's motion to dismiss the plaintiffs' cases for a lack of personal jurisdiction. Blackrock asserted it was a foreign

_____

[50] The insurer for AL Solutions stated there was a total of $16,500,000.00 in available coverage. However, $703,698.20 of that coverage was set aside for defense costs and expenses on behalf of Tremont and Blackrock. The insurer reserved the right to seek reimbursement of those costs and expenses in the event the indemnification and no-liability clauses are unenforceable, and agreed make that money available to the plaintiffs.

28

corporation that never transacted business in West Virginia. Alternatively, it asserted that the plaintiffs' claims did not arise out of Blackrock's contacts with West Virginia.

On May 6, 2015, the circuit court sent the parties a letter stating it had received the motion for partial summary judgment on unconscionability filed by AL Solutions. The circuit court ordered "any party wishing to file a response shall do so by **June 12, 2015.**"

Fifteen days later, on May 21st, the circuit court entered an order granting the plaintiffs' motion to distribute the insurance policy funds. However, in that order, the circuit court mentioned two other dates. Firstly, the circuit court noted Blackrock's motion to dismiss for lack of personal jurisdiction, and anticipated Blackrock "will receive a decision on that issue by July 1, 2015." Secondly, and more importantly, the circuit court discussed Tremont and Blackrock's claim that AL Solutions was "contractually obligated to defend and indemnify them herein pursuant to certain agreements the parties entered into in December, 2006[.]" The circuit court stated that, "[i]f the issue of indemnification and the validity of the agreements . . . still remains after the [circuit court] issues its decision on Jurisdiction, the parties must fully brief the issue by **October 30, 2015.**"

On June 12, 2015, Tremont filed its response to AL Solutions's motion for partial summary judgment, in compliance with the circuit court's letter. Tremont's response was 18 pages long and contained 40 pages of exhibits.

Blackrock, however, did not file a full response. Instead, Blackrock filed a two-paragraph "initial response" to the motion for partial summary judgment. Blackrock stated generally that it opposed the motion, but said Blackrock would respond to "that

29

motion by October 30, 2015 in the event the issue remains pertinent as to them following the Court's anticipated ruling on their [Blackrock's] jurisdictional motion."

On June 18, 2015, the circuit court entered an order denying Blackrock's jurisdictional motion. Lastly, on August 19, 2015, the circuit court entered a detailed "distribution order" distributing the insurance policy funds to the plaintiffs.

On September 18, 2015, the parties filed two pleadings in this Court implicating the indemnification clauses.[51] AL Solutions petitioned for a writ of prohibition against the distribution order, arguing that the order deprived AL Solutions of insurance money to pay indemnification claims by Tremont and Blackrock.[52] Blackrock filed a notice of appeal of the same distribution order, and asserted that the order removed Blackrock's right to indemnification under the management agreements.[53]

The circuit court somehow learned that the parties' arguments before this Court all hinged upon the indemnification clauses. In response, on October 8, 2015, the circuit court sent the parties a letter stating it wanted AL Solutions to draft a proposed order granting the motion for partial summary judgment and finding the indemnification and no-

---

[51] Blackrock contemporaneously filed a third proceeding, a petition for a writ of prohibition, to halt enforcement of the circuit court's jurisdiction order. The Court refused the petition on November 4, 2015. *See State ex rel. Blackrock Capital Investment Corporation, et al. v. The Honorable Ronald E. Wilson, et al.*, No. 15-0797.

[52] *See State ex rel. AL Solutions, Inc., v. The Honorable Ronald E. Wilson, et al.*, No. 15-0897. The Court refused the petition on November 3, 2015.

[53] *See Blackrock Capital Investment Corp., et al. v. Jeffrey Fish, et al.*, No. 15-0942. On November 17, 2015, this Court granted the plaintiffs' motion to dismiss the appeal on the ground that the distribution order was interlocutory and not appealable.

liability clauses unconscionable. The circuit court required AL Solutions to submit the proposed order by October 13th, and any party wanting to file objections was required to do so by October 15th. The goal of the circuit court was to enter the order and submit it to this Court no later than October 16th.

On October 13th, AL Solutions submitted its proposed order. After AL Solutions delivered its proposed order, Blackrock hand delivered to the circuit court a five-page request to enlarge the time to file objections until October 30th. Blackrock's request said that if Blackrock had additional time then it would be "permitted . . . to file exhibits and other evidence" to support its opposition to the motion for partial summary judgment. Blackrock, however, did not describe for the circuit court what these exhibits or other evidence might show. The circuit court promptly denied the request for an extension.

In accordance with the circuit court's deadline, on October 15th, Tremont filed its objections to the proposed order, consisting of 15 pages of arguments. Tremont also attached eight pages of exhibits to its objections.

Blackrock filed seven pages of objections. Blackrock filed no exhibits of its own nor did it make any mention of exhibits or evidence critical to its position.[54] Blackrock argued, as it does in this appeal, that the circuit court should have applied New York law and found the agreements procedurally and substantively fair.

---

[54] An affidavit from Blackrock's attorney was attached to the response reasserting that Blackrock needed until October 30th to properly respond. The attorney averred that Blackrock was prepared to meet the October 30th deadline, and at that time would submit "opposition evidence[.]"

The next day, October 16, 2015, the circuit court entered its order granting partial summary judgment to AL Solutions, and found the indemnification and no-liability clauses were unconscionable. A copy of the order was e-mailed to this Court.[55]

Blackrock argues it was harmed by the circuit court's "precipitous procedural decision" in this case. Blackrock does not dispute that "a trial court has plenary power to reconsider, revise, alter or amend an interlocutory order[.]"[56] Further, Blackrock rightly states that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."[57] In weighing the motion, "all exhibits and affidavits and other matters submitted by both parties should be considered by the court[.]"[58]

---

[55] On October 19th, the circuit court notified Blackrock by letter that it did not review Blackrock's objections until after the partial summary judgment order was signed. Blackrock appears to have e-mailed its objections to the circuit judge's law clerk, and ignored the automatic reply message saying the law clerk was on vacation. However, despite Blackrock's objections, the circuit court concluded it would not withdraw its order. While the circuit court's action was abrupt, we have given careful and thorough review to the issues raised by Blackrock in the record.

[56] Syllabus Point 2, in part, *Taylor v. Elkins Home Show, Inc.*, 210 W.Va. 612, 558 S.E.2d 611 (2001).

[57] Syllabus Point 3, *Aetna Cas. & Sur. Co*, 148 W.Va. at 160, 133 S.E.2d at 771.

[58] Syllabus Point 3, in part, *Haga v. King Coal Chevrolet Co.*, 151 W.Va. 125, 150 S.E.2d 599 (1966). *Accord*, Syllabus Point 2, *Aetna Cas. & Sur. Co.*, 148 W.Va. at 160, 133 S.E.2d at 771 ("On a motion for summary judgment all papers of record and all matters submitted by both parties should be considered by the court.").

Blackrock also argues, "[I]t is a fundamental requirement of due process to be given 'the opportunity to be heard "at a meaningful time and in a meaningful manner."'"[59]

Blackrock contends the circuit court violated these fundamental rules, because it shifted the briefing deadlines and ruled without the benefit of briefing and evidence by Blackrock.

After a review of the lengthy record, we are not persuaded by Blackrock's arguments. Between the filing of AL Solutions's motion for partial summary judgment and entry of the circuit court's order, Tremont (Blackrock's identically situated co-defendant) repeatedly succeeded in doing the things Blackrock says it could not. At the same time Blackrock says the circuit court stripped it of a chance to respond, Tremont filed a detailed reply to the motion that was replete with argument and exhibits. Tremont also filed detailed objections to the order proposed by AL Solutions, again including argument and exhibits. In light of Tremont's actions, we cannot say that the circuit court wholly deprived Blackrock of an opportunity to submit "exhibits and affidavits and other matters" to the court, or deprived it of an ability to advise the circuit court of argument or evidence favorable to its case.

---

[59] *Hutchison v. City of Huntington*, 198 W.Va. 139, 154, 479 S.E.2d 649, 664 (1996) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965))). *See also Stull v. Firemen's Pension & Relief Fund of City of Charleston*, 202 W.Va. 440, 447, 504 S.E.2d 903, 910 (1998) ("[T]he opportunity to be heard at a meaningful time and in a meaningful manner is a fundamental requirement of due process."); *Marcus v. Holley*, 217 W.Va. 508, 527, 618 S.E.2d 517, 536 (2005) ("Procedural due process rights entitle an individual to representation by counsel, notice, an opportunity to be heard, and the right to present evidence.").

Furthermore, Blackrock claims the record is incomplete and missing evidence crucial to its case. The three-volume appendix record is some 1,990 pages long, and contains depositions of the actors who participated in forming the management agreements and in running AL Solutions, plus numerous documents. Nevertheless, nowhere in the record can we find any instance where Blackrock made an effort to proffer its supposedly crucial evidence to the circuit court. Nowhere can we find any effort by Blackrock to advise the circuit court what evidence existed that created a material fact. Even in its appellate briefs to this Court, Blackrock did not suggest what this evidence might be.

Only during oral argument did counsel finally indicate that Blackrock wanted to introduce expert testimony explaining that the indemnification and no-liability clauses were common in these types of transactions, and that under the law these clauses would not be unconscionable. Blackrock seeks to have this case returned to circuit court to permit the revelation of this expert testimony. However, even if we were to return this case to the circuit court, we question whether the expert opinion would be admissible:

> As a general rule, an expert witness may not testify as to questions of law such as the principles of law applicable to a case, the interpretation of a statute, the meaning of terms in a statute, the interpretation of case law, or the legality of conduct. It is the role of the trial judge to determine, interpret and apply the law applicable to a case.[60]

---

[60] Syllabus Point 10, *France v. Southern Equip. Co.*, 225 W.Va. 1, 689 S.E.2d 1 (2010).

The record shows the issue of unconscionability was well developed by the plaintiffs, AL Solutions, Tremont and Blackrock. Tremont and Blackrock's briefs and objections to the circuit court established the framework of unconscionability law, and Blackrock's brief to this Court further developed those same legal arguments. On this record, we cannot say that the circuit court deprived Blackrock of an opportunity to respond meaningfully to the motion for partial summary judgment. Blackrock has made no showing that the circuit court prevented it from expressing some meaningful legal argument, or prevented it from revealing evidence of a genuine issue of material fact. We therefore find no error in the manner in which the circuit court entered the partial summary judgment order.

## V.
## CONCLUSION

This Court accepts that indemnification and no-liability clauses are common in business contracts; in this instance, however, the clauses were oppressive and unfair. We have reviewed the record *de novo*, using the same standards as the circuit court would use, and found the indemnification and no-liability clauses unconscionable and unenforceable. We further find no error in the manner in which the circuit court entered its order.

Accordingly, the circuit court's October 16, 2015, order granting partial summary judgment is affirmed.

Affirmed.